# CITY OF CLEBURNE, TEXAS, ET AL. *v.* CLEBURNE LIVING CENTER, INC., ET AL.

No. 84–468.   Argued March 18, 1985—Reargued April 23, 1985—Decided
July 1, 1985

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. STEVENS, J., filed a concurring opinion, in which BURGER, C. J., joined, *post*, p. 451. MARSHALL, J., filed an opinion concurring in the judgment in part and dissenting in part, in which BRENNAN and BLACKMUN, JJ., joined, *post*, p. 455.

*Earl Luna* reargued the cause for petitioners. With him on the briefs were *Robert T. Miller, Jr.,* and *Mary Milford.*

*Renea Hicks* reargued the cause for respondents. With him on the brief were *Diane Shisk* and *Caryl Oberman.**

---

*Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Solicitor General Fried, Deputy Assistant Attorney General Cooper,* and *Walter W. Barnett* filed a brief for the United States as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Connecticut et al. by *Joseph I. Lieberman,* Attorney General of Connecticut, *Elliot F. Gerson,* Deputy Attorney General, and *Henry S. Cohn,* Assistant Attorney General, *John Steven Clark,* Attorney General of Arkansas, *John K. Van de Kamp,* Attorney General of California, *Duane Woodard,* Attorney General of Colorado, *Neil F. Hartigan,* Attorney General of Illinois, *Jill Wine-Banks,* Solicitor General, and *Robert J. Connor,* Special Assistant Attorney General, *William J. Guste, Jr.,* Attorney General of Louisiana, and *Robert A. Barnett,* Assistant Attorney General, *Nicholas J. Spaeth,* Attorney General of North Dakota, *Arlene Violet,* Attorney General of Rhode Island, *W. J. Michael Cody,* Attorney General of Tennessee, and *Charles G. Brown,* Attorney General of West Virginia; for the State of Maryland by *Stephen H. Sachs,* Attorney General, *Dennis M. Sweeney,* Deputy Attorney General, and *Judith K. Sykes,* Assistant Attorney General; for the State of Pennsylvania et al. by *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Allen C. Warshaw,* Chief Deputy Attorney General, and *Andrew S. Gordon,* Senior Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Thomas J. Miller* of Iowa, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Stephen E. Merrill* of New Hampshire, *Irwin I. Kimmelman* of New Jersey, *Anthony J. Celebrezze, Jr.,* of Ohio, and *Bronson C. La Follette* of Wisconsin; for the State of Texas et al. by *Jim Mattox,* Attorney General of Texas, *David R. Richards, J. Patrick Wiseman,* and *James C. Todd* and *Philip Durst,* Assistant Attorneys General; for the American Association on Mental Deficiency et al. by *James W. Ellis, Ruth A. Luckasson, Stanley S. Herr,* and *Donald N. Bersoff;* for the American Civil Liberties Union Foundation et al. by *Burt Neuborne, Charles S. Sims, Robert M. Levy, Paul Hoffman, Stanley Fleishman, Joseph Lawrence, James Preis,* and *James C. Harrington;* for the Association for Retarded Citizens/USA et al. by *Thomas K. Gilhool, Frank J. Laski, Michael Churchill,* and *Timothy M. Cook;* for the Disability Rights Education and Defense Fund by *Arlene Brynne Mayerson;* for Disabled Peoples' International and Human Rights Advocates, Inc., by *Karen*

JUSTICE WHITE delivered the opinion of the Court.

A Texas city denied a special use permit for the operation of a group home for the mentally retarded, acting pursuant to a municipal zoning ordinance requiring permits for such homes. The Court of Appeals for the Fifth Circuit held that mental retardation is a "quasi-suspect" classification and that the ordinance violated the Equal Protection Clause because it did not substantially further an important governmental purpose. We hold that a lesser standard of scrutiny is appropriate, but conclude that under that standard the ordinance is invalid as applied in this case.

I

In July 1980, respondent Jan Hannah purchased a building at 201 Featherston Street in the city of Cleburne, Texas, with the intention of leasing it to Cleburne Living Center, Inc. (CLC),[1] for the operation of a group home for the mentally retarded. It was anticipated that the home would house 13 retarded men and women, who would be under the constant supervision of CLC staff members. The house had four bedrooms and two baths, with a half bath to be added. CLC planned to comply with all applicable state and federal regulations.[2]

---

*Parker;* and for the National Conference of Catholic Charities et al. by *Lewis Golinker, Herbert Semmel,* and *Kathleen E. Surgalla.*

*Elliott W. Atkinson, Jr.,* filed a brief for the Federation of Greater Baton Rouge Civic Associations, Inc., as *amicus curiae.*

[1] Cleburne Living Center, Inc., is now known as Community Living Concepts, Inc. Hannah is the vice president and part owner of CLC. For convenience, both Hannah and CLC will be referred to as "CLC." A third respondent is Advocacy, Inc., a nonprofit corporation that provides legal services to developmentally disabled persons.

[2] It was anticipated that the home would be operated as a private Level I Intermediate Care Facility for the Mentally Retarded, or ICF–MR, under a program providing for joint federal-state reimbursement for residential services for mentally retarded clients. See 42 U. S. C. § 1396d(a)(15);

The city informed CLC that a special use permit would be required for the operation of a group home at the site, and CLC accordingly submitted a permit application. In response to a subsequent inquiry from CLC, the city explained that under the zoning regulations applicable to the site, a special use permit, renewable annually, was required for the construction of "[h]ospitals for the insane or feeble-minded, or alcoholic [sic] or drug addicts, or penal or correctional institutions."[3] The city had determined that the proposed

Tex. Human Resources Code Ann. § 32.001 et seq. (1980 and Supp. 1985). ICF–MR's are covered by extensive regulations and guidelines established by the United States Department of Health and Human Services and the Texas Departments of Human Resources, Mental Health and Mental Retardation, and Health. See App. 92. See also 42 CFR § 442.1 et seq. (1984); 40 Tex. Adm. Code § 27.101 et seq. (1981).

[3] The site of the home is in an area zoned "R–3," an "Apartment House District." App. 51. Section 8 of the Cleburne zoning ordinance, in pertinent part, allows the following uses in an R–3 district:

"1. Any use permitted in District R–2.

"2. Apartment houses, or multiple dwellings.

"3. Boarding and lodging houses.

"4. Fraternity or sorority houses and dormitories.

"5. Apartment hotels.

"6. Hospitals, sanitariums, nursing homes or homes for convalescents or aged, other than for the insane or feeble-minded or alcoholics or drug addicts."

"7. Private clubs or fraternal orders, except those whose chief activity is carried on as a business.

"8. Philanthropic or eleemosynary institutions, other than penal institutions.

"9. Accessory uses customarily incident to any of the above uses . . . ."

Id., at 60–61 (emphasis added).

Section 16 of the ordinance specifies the uses for which a special use permit is required. These include "[h]ospitals for the insane or feeble-minded, or alcoholic [sic] or drug addicts, or penal or correctional institutions." Id., at 63. Section 16 provides that a permit for such a use may be issued by "the Governing Body, after public hearing, and after recommendation of the Planning Commission." All special use permits are limited to one year, and each applicant is required "to obtain the signatures of the property owners within two hundred (200) feet of the property to be used." Ibid.

group home should be classified as a "hospital for the feeble-minded." After holding a public hearing on CLC's application, the City Council voted 3 to 1 to deny a special use permit.[4]

CLC then filed suit in Federal District Court against the city and a number of its officials, alleging, *inter alia*, that the zoning ordinance was invalid on its face and as applied because it discriminated against the mentally retarded in violation of the equal protection rights of CLC and its potential residents. The District Court found that "[i]f the potential residents of the Featherston Street home were not mentally retarded, but the home was the same in all other respects, its use would be permitted under the city's zoning ordinance," and that the City Council's decision "was motivated primarily by the fact that the residents of the home would be persons who are mentally retarded." App. 93, 94. Even so, the District Court held the ordinance and its application constitutional. Concluding that no fundamental right was implicated and that mental retardation was neither a suspect nor a quasi-suspect classification, the court employed the minimum level of judicial scrutiny applicable to equal protection claims. The court deemed the ordinance, as written and applied, to be rationally related to the city's legitimate interests in "the legal responsibility of CLC and its residents, . . . the safety and fears of residents in the adjoining neighborhood," and the number of people to be housed in the home.[5] *Id.*, at 103.

The Court of Appeals for the Fifth Circuit reversed, determining that mental retardation was a quasi-suspect classification and that it should assess the validity of the ordinance

---

[4] The city's Planning and Zoning Commission had earlier held a hearing and voted to deny the permit. *Id.*, at 91.

[5] The District Court also rejected CLC's other claims, including the argument that the city had violated due process by improperly delegating its zoning powers to the owners of adjoining property. App. 105. Cf. *Washington ex rel. Seattle Title Trust Co.* v. *Roberge*, 278 U. S. 116 (1928). The Court of Appeals did not address this argument, and it has not been raised by the parties in this Court.

under intermediate-level scrutiny. 726 F. 2d 191 (1984). Because mental retardation was in fact relevant to many legislative actions, strict scrutiny was not appropriate. But in light of the history of "unfair and often grotesque mistreatment" of the retarded, discrimination against them was "likely to reflect deep-seated prejudice." *Id.*, at 197. In addition, the mentally retarded lacked political power, and their condition was immutable. The court considered heightened scrutiny to be particularly appropriate in this case, because the city's ordinance withheld a benefit which, although not fundamental, was very important to the mentally retarded. Without group homes, the court stated, the retarded could never hope to integrate themselves into the community.[6] Applying the test that it considered appropriate, the court held that the ordinance was invalid on its face because it did not substantially further any important governmental interests. The Court of Appeals went on to hold that the ordinance was also invalid as applied.[7] Rehearing en banc was

---

[6] The District Court had found:

"Group homes currently are the principal community living alternatives for persons who are mentally retarded. The availability of such a home in communities is an essential ingredient of normal living patterns for persons who are mentally retarded, and each factor that makes such group homes harder to establish operates to exclude persons who are mentally retarded from the community." App. 94.

[7] The city relied on a recently passed state regulation limiting group homes to 6 residents in support of its argument that the CLC home would be overcrowded with 13. But, the Court of Appeals observed, the city had failed to justify its apparent view that any other group of 13 people could live under these allegedly "crowded" conditions, nor had it explained why 6 would be acceptable but 13 not.

CLC concedes that it could not qualify for certification under the new Texas regulation. Tr. of Oral Rearg. 31. The Court of Appeals stated that the new regulation applied only to applications made after May 1, 1982, and therefore did not apply to the CLC home. 726 F. 2d, at 202. The regulation itself contains no grandfather clause, see App. 78–81, and the District Court made no specific finding on this point. See *id.*, at 96. However, the State has asserted in an *amici* brief filed in this Court that "'the six bed rule' would not pose an obstacle to the proposed Featherston

denied with six judges dissenting in an opinion urging en banc consideration of the panel's adoption of a heightened standard of review.  We granted certiorari, 469 U. S. 1016 (1984).[8]

## II

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  *Plyler* v. *Doe*, 457 U. S. 202, 216 (1982).  Section 5 of the Amendment empowers Congress to enforce this mandate, but absent controlling congressional direction, the courts have themselves devised standards for

---

Street group home at issue in this case."  Brief for State of Texas et al. as *Amici Curiae* 15, n. 7.  If the six-bed requirement were to apply to the home, there is a serious possibility that CLC would no longer be interested in injunctive relief.  David Southern, an officer of CLC, testified that "to break even on a facility of this type, you have to have at least ten or eleven residents."  App. 32.  However, because CLC requested damages as well as an injunction, see *id.*, at 15, the case would not be moot.

After oral argument, the city brought to our attention the recent enactment of a Texas statute, effective September 1, 1985, providing that "family homes" are permitted uses in "all residential zones or districts in this state."  The statute defines a "family home" as a community-based residence housing no more than six disabled persons, including the mentally retarded, along with two supervisory personnel.  The statute does not appear to affect the city's actions with regard to group homes that plan to house more than six residents.  The enactment of this legislation therefore does not affect our disposition of this case.

[8] *Macon Assn. for Retarded Citizens* v. *Macon-Bibb County Planning and Zoning Comm'n*, 252 Ga. 484, 314 S. E. 2d 218 (1984), dism'd for want of a substantial federal question, 469 U. S. 802 (1984), has no controlling effect on this case.  *Macon Assn. for Retarded Citizens* involved an ordinance that had the effect of excluding a group home for the retarded only because it restricted dwelling units to those occupied by a single family, defined as no more than four unrelated persons.  In *Village of Belle Terre* v. *Boraas*, 416 U. S. 1 (1974), we upheld the constitutionality of a similar ordinance, and the Georgia Supreme Court in *Macon Assn.* specifically held that the ordinance did not discriminate against the retarded.  252 Ga., at 487, 314 S. E. 2d, at 221.

440

determining the validity of state legislation or other official action that is challenged as denying equal protection. The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *Schweiker* v. *Wilson*, 450 U. S. 221, 230 (1981); *United States Railroad Retirement Board* v. *Fritz*, 449 U. S. 166, 174–175 (1980); *Vance* v. *Bradley*, 440 U. S. 93, 97 (1979); *New Orleans* v. *Dukes*, 427 U. S. 297, 303 (1976). When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, *United States Railroad Retirement Board* v. *Fritz, supra,* at 174; *New Orleans* v. *Dukes, supra,* at 303, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.

The general rule gives way, however, when a statute classifies by race, alienage, or national origin. These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *McLaughlin* v. *Florida*, 379 U. S. 184, 192 (1964); *Graham* v. *Richardson*, 403 U. S. 365 (1971). Similar oversight by the courts is due when state laws impinge on personal rights protected by the Constitution. *Kramer* v. *Union Free School District No. 15*, 395 U. S. 621 (1969); *Shapiro* v. *Thompson*, 394 U. S. 618 (1969); *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535 (1942).

Legislative classifications based on gender also call for a heightened standard of review. That factor generally provides no sensible ground for differential treatment. "[W]hat differentiates sex from such nonsuspect statuses as intelligence or physical disability . . . is that the sex characteristic

frequently bears no relation to ability to perform or contribute to society." *Frontiero* v. *Richardson*, 411 U. S. 677, 686 (1973) (plurality opinion). Rather than resting on meaningful considerations, statutes distributing benefits and burdens between the sexes in different ways very likely reflect outmoded notions of the relative capabilities of men and women. A gender classification fails unless it is substantially related to a sufficiently important governmental interest. *Mississippi University for Women* v. *Hogan*, 458 U. S. 718 (1982); *Craig* v. *Boren*, 429 U. S. 190 (1976). Because illegitimacy is beyond the individual's control and bears "no relation to the individual's ability to participate in and contribute to society," *Mathews* v. *Lucas*, 427 U. S. 495, 505 (1976), official discriminations resting on that characteristic are also subject to somewhat heightened review. Those restrictions "will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest." *Mills* v. *Habluetzel*, 456 U. S. 91, 99 (1982).

We have declined, however, to extend heightened review to differential treatment based on age:

> "While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307, 313 (1976).

The lesson of *Murgia* is that where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be

pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end.

## III

Against this background, we conclude for several reasons that the Court of Appeals erred in holding mental retardation a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation. First, it is undeniable, and it is not argued otherwise here, that those who are mentally retarded have a reduced ability to cope with and function in the everyday world. Nor are they all cut from the same pattern: as the testimony in this record indicates, they range from those whose disability is not immediately evident to those who must be constantly cared for.[9] They are thus different, immutably so, in relevant respects, and the States' interest in dealing with and providing for them is plainly a legitimate one.[10] How this large and diversified group is to be treated

---

[9] Mentally retarded individuals fall into four distinct categories. The vast majority—approximately 89%—are classified as "mildly" retarded, meaning that their IQ is between 50 and 70. Approximately 6% are "moderately" retarded, with IQs between 35 and 50. The remaining two categories are "severe" (IQs of 20 to 35) and "profound" (IQs below 20). These last two categories together account for about 5% of the mentally retarded population. App. 39 (testimony of Dr. Philip Roos).

Mental retardation is not defined by reference to intelligence or IQ alone, however. The American Association on Mental Deficiency (AAMD) has defined mental retardation as " 'significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.' " Brief for AAMD et al. as *Amici Curiae* 3 (quoting AAMD, Classification in Mental Retardation 1 (H. Grossman ed. 1983)). "Deficits in adaptive behavior" are limitations on general ability to meet the standards of maturation, learning, personal independence, and social responsibility expected for an individual's age level and cultural group. Brief for AAMD et al. as *Amici Curiae* 4, n. 1. Mental retardation is caused by a variety of factors, some genetic, some environmental, and some unknown. *Id.*, at 4.

[10] As Dean Ely has observed:

"Surely one has to feel sorry for a person disabled by something he or she can't do anything about, but I'm not aware of any reason to suppose that

under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary. Heightened scrutiny inevitably involves substantive judgments about legislative decisions, and we doubt that the predicate for such judicial oversight is present where the classification deals with mental retardation.

Second, the distinctive legislative response, both national and state, to the plight of those who are mentally retarded demonstrates not only that they have unique problems, but also that the lawmakers have been addressing their difficulties in a manner that belies a continuing antipathy or prejudice and a corresponding need for more intrusive oversight by the judiciary. Thus, the Federal Government has not only outlawed discrimination against the mentally retarded in federally funded programs, see § 504 of the Rehabilitation Act of 1973, 29 U. S. C. § 794, but it has also provided the retarded with the right to receive "appropriate treatment, services, and habilitation" in a setting that is "least restrictive of [their] personal liberty." Developmental Disabilities Assistance and Bill of Rights Act, 42 U. S. C. §§ 6010(1), (2). In addition, the Government has conditioned federal education funds on a State's assurance that retarded children will enjoy an education that, "to the maximum extent appropriate," is integrated with that of nonmentally retarded children. Education of the Handicapped Act, 20 U. S. C. § 1412(5)(B). The Government has also facilitated the hiring of the mentally retarded into the federal civil service by exempting them from the requirement of competitive examina-

---

elected officials are unusually unlikely to share that feeling. Moreover, classifications based on physical disability and intelligence are typically accepted as legitimate, even by judges and commentators who assert that immutability is relevant. The explanation, when one is given, is that *those* characteristics (unlike the one the commentator is trying to render suspect) are often relevant to legitimate purposes. At that point there's not much left of the immutability theory, is there?" J. Ely, Democracy and Distrust 150 (1980) (footnote omitted). See also *id.*, at 154–155.

tion. See 5 CFR § 213.3102(t) (1984). The State of Texas has similarly enacted legislation that acknowledges the special status of the mentally retarded by conferring certain rights upon them, such as "the right to live in the least restrictive setting appropriate to [their] individual needs and abilities," including "the right to live . . . in a group home." Mentally Retarded Persons Act of 1977, Tex. Rev. Civ. Stat. Ann., Art. 5547–300, § 7 (Vernon Supp. 1985).[11]

Such legislation thus singling out the retarded for special treatment reflects the real and undeniable differences between the retarded and others. That a civilized and decent society expects and approves such legislation indicates that governmental consideration of those differences in the vast majority of situations is not only legitimate but also desirable. It may be, as CLC contends, that legislation designed to benefit, rather than disadvantage, the retarded would generally withstand examination under a test of heightened scrutiny. See Brief for Respondents 38–41. The relevant inquiry, however, is whether heightened scrutiny is constitutionally mandated in the first instance. Even assuming that many of these laws could be shown to be substantially related to an important governmental purpose, merely requiring the legislature to justify its efforts in these terms may lead it to refrain from acting at all. Much recent legislation intended to benefit the retarded also assumes the need for measures that might be perceived to disadvantage them. The Education of the Handicapped Act, for example, requires an "appropriate" education, not one that is equal in all respects

---

[11] CLC originally sought relief under the Act, but voluntarily dismissed this pendent state claim when the District Court indicated that its presence might make abstention appropriate. The Act had never been construed by the Texas courts. App. 12, 14, 84–87.

A number of States have passed legislation prohibiting zoning that excludes the retarded. See, e. g., Cal. Health & Safety Code Ann. § 1566 et seq. (West 1979 and Supp. 1985); Conn. Gen. Stat. § 8–3e (Supp. 1985); N. D. Cent. Code § 25–16–14(2) (Supp. 1983); R. I. Gen. Laws. § 45–24–22 (1980). See also Md. Health Code Ann. § 7–102 (Supp. 1984).

to the education of nonretarded children; clearly, admission to a class that exceeded the abilities of a retarded child would not be appropriate.[12]   Similarly, the Developmental Disabilities Assistance Act and the Texas Act give the retarded the right to live only in the "least restrictive setting" appropriate to their abilities, implicitly assuming the need for at least some restrictions that would not be imposed on others.[13] Especially given the wide variation in the abilities and needs of the retarded themselves, governmental bodies must have a certain amount of flexibility and freedom from judicial oversight in shaping and limiting their remedial efforts.

Third, the legislative response, which could hardly have occurred and survived without public support, negates any claim that the mentally retarded are politically powerless in the sense that they have no ability to attract the attention of the lawmakers.   Any minority can be said to be powerless to assert direct control over the legislature, but if that were a criterion for higher level scrutiny by the courts, much economic and social legislation would now be suspect.

Fourth, if the large and amorphous class of the mentally retarded were deemed quasi-suspect for the reasons given by the Court of Appeals, it would be difficult to find a principled way to distinguish a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large.   One need mention in this respect only

---

[12] The Act, which specifically included the mentally retarded in its definition of handicapped, see 20 U. S. C. § 1401(1), also recognizes the great variations within the classification of retarded children.   The Act requires that school authorities devise an "individualized educational program," § 1401(19), that is "tailored to the unique needs of the handicapped child." *Hendrick Hudson District Board of Education* v. *Rowley*, 458 U. S. 176, 181 (1982).

[13] The Developmental Disabilities Assistance Act also withholds public funds from any program that does not prohibit the use of physical restraint "unless absolutely necessary."   42 U. S. C. § 6010(3).

the aging, the disabled, the mentally ill, and the infirm. We are reluctant to set out on that course, and we decline to do so.

Doubtless, there have been and there will continue to be instances of discrimination against the retarded that are in fact invidious, and that are properly subject to judicial correction under constitutional norms. But the appropriate method of reaching such instances is not to create a new quasi-suspect classification and subject all governmental action based on that classification to more searching evaluation. Rather, we should look to the likelihood that governmental action premised on a particular classification is valid as a general matter, not merely to the specifics of the case before us. Because mental retardation is a characteristic that the government may legitimately take into account in a wide range of decisions, and because both State and Federal Governments have recently committed themselves to assisting the retarded, we will not presume that any given legislative action, even one that disadvantages retarded individuals, is rooted in considerations that the Constitution will not tolerate.

Our refusal to recognize the retarded as a quasi-suspect class does not leave them entirely unprotected from invidious discrimination. To withstand equal protection review, legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose. This standard, we believe, affords government the latitude necessary both to pursue policies designed to assist the retarded in realizing their full potential, and to freely and efficiently engage in activities that burden the retarded in what is essentially an incidental manner. The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. See *Zobel* v. *Williams*, 457 U. S. 55, 61–63 (1982); *United States Dept. of Agriculture* v. *Moreno*, 413 U. S. 528, 535 (1973). Furthermore, some objectives —

such as "a bare . . . desire to harm a politically unpopular group," *id.*, at 534—are not legitimate state interests. See also *Zobel, supra,* at 63. Beyond that, the mentally retarded, like others, have and retain their substantive constitutional rights in addition to the right to be treated equally by the law.

## IV

We turn to the issue of the validity of the zoning ordinance insofar as it requires a special use permit for homes for the mentally retarded.[14] We inquire first whether requiring a special use permit for the Featherston home in the circumstances here deprives respondents of the equal protection of the laws. If it does, there will be no occasion to decide whether the special use permit provision is facially invalid where the mentally retarded are involved, or to put it another way, whether the city may never insist on a special use permit for a home for the mentally retarded in an R–3 zone. This is the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments. *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 501–502 (1985); *United States* v. *Grace*, 461 U. S. 171 (1983); *NAACP* v. *Button*, 371 U. S. 415 (1963).

The constitutional issue is clearly posed. The city does not require a special use permit in an R–3 zone for apartment houses, multiple dwellings, boarding and lodging houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes for convalescents or the aged (other than for the insane or feebleminded or alcoholics or drug addicts), private clubs or fraternal orders, and other specified uses. It does, however, insist on a special permit for the Featherston home, and it does so, as the District Court found, because it would be a facility for the men-

---

[14] It goes without saying that there is nothing before us with respect to the validity of requiring a special use permit for the other uses listed in the ordinance. See n. 3, *supra*.

tally retarded. May the city require the permit for this facility when other care and multiple-dwelling facilities are freely permitted?

It is true, as already pointed out, that the mentally retarded as a group are indeed different from others not sharing their misfortune, and in this respect they may be different from those who would occupy other facilities that would be permitted in an R–3 zone without a special permit. But this difference is largely irrelevant unless the Featherston home and those who would occupy it would threaten legitimate interests of the city in a way that other permitted uses such as boarding houses and hospitals would not. Because in our view the record does not reveal any rational basis for believing that the Featherston home would pose any special threat to the city's legitimate interests, we affirm the judgment below insofar as it holds the ordinance invalid as applied in this case.

The District Court found that the City Council's insistence on the permit rested on several factors. First, the Council was concerned with the negative attitude of the majority of property owners located within 200 feet of the Featherston facility, as well as with the fears of elderly residents of the neighborhood. But mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like. It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause, *Lucas* v. *Forty-Fourth General Assembly of Colorado,* 377 U. S. 713, 736–737 (1964), and the city may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore* v. *Sidoti,* 466 U. S. 429, 433 (1984).

Second, the Council had two objections to the location of the facility. It was concerned that the facility was across the street from a junior high school, and it feared that the students might harass the occupants of the Featherston home. But the school itself is attended by about 30 mentally retarded students, and denying a permit based on such vague, undifferentiated fears is again permitting some portion of the community to validate what would otherwise be an equal protection violation. The other objection to the home's location was that it was located on "a five hundred year flood plain." This concern with the possibility of a flood, however, can hardly be based on a distinction between the Featherston home and, for example, nursing homes, homes for convalescents or the aged, or sanitariums or hospitals, any of which could be located on the Featherston site without obtaining a special use permit. The same may be said of another concern of the Council—doubts about the legal responsibility for actions which the mentally retarded might take. If there is no concern about legal responsibility with respect to other uses that would be. permitted in the area, such as boarding and fraternity houses, it is difficult to believe that the groups of mildly or moderately mentally retarded individuals who would live at 201 Featherston would present any different or special hazard.

Fourth, the Council was concerned with the size of the home and the number of people that would occupy it. The District Court found, and the Court of Appeals repeated, that "[i]f the potential residents of the Featherston Street home were not mentally retarded, but the home was the same in all other respects, its use would be permitted under the city's zoning ordinance." App. 93; 726 F. 2d, at 200. Given this finding, there would be no restrictions on the number of people who could occupy this home as a boarding house, nursing home, family dwelling, fraternity house, or dormitory. The question is whether it is rational to treat the mentally retarded differently. It is true that they suffer dis-

ability not shared by others; but why this difference warrants a density regulation that others need not observe is not at all apparent. At least this record does not clarify how, in this connection, the characteristics of the intended occupants of the Featherston home rationally justify denying to those occupants what would be permitted to groups occupying the same site for different purposes. Those who would live in the Featherston home are the type of individuals who, with supporting staff, satisfy federal and state standards for group housing in the community; and there is no dispute that the home would meet the federal square-footage-per-resident requirement for facilities of this type. See 42 CFR § 442.447 (1984). In the words of the Court of Appeals, "[t]he City never justifies its apparent view that other people can live under such 'crowded' conditions when mentally retarded persons cannot." 726 F. 2d, at 202.

In the courts below the city also urged that the ordinance is aimed at avoiding concentration of population and at lessening congestion of the streets. These concerns obviously fail to explain why apartment houses, fraternity and sorority houses, hospitals and the like, may freely locate in the area without a permit. So, too, the expressed worry about fire hazards, the serenity of the neighborhood, and the avoidance of danger to other residents fail rationally to justify singling out a home such as 201 Featherston for the special use permit, yet imposing no such restrictions on the many other uses freely permitted in the neighborhood.

The short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded, including those who would occupy the Featherston facility and who would live under the closely supervised and highly regulated conditions expressly provided for by state and federal law.

The judgment of the Court of Appeals is affirmed insofar as it invalidates the zoning ordinance as applied to the Featherston home. The judgment is otherwise vacated, and the case is remanded.

*It is so ordered.*

JUSTICE STEVENS, with whom THE CHIEF JUSTICE joins, concurring.

The Court of Appeals disposed of this case as if a critical question to be decided were which of three clearly defined standards of equal protection review should be applied to a legislative classification discriminating against the mentally retarded.[1] In fact, our cases have not delineated three—or even one or two—such well-defined standards.[2] Rather, our cases reflect a continuum of judgmental responses to differing classifications which have been explained in opinions by terms ranging from "strict scrutiny" at one extreme to "rational basis" at the other. I have never been persuaded that these so-called "standards" adequately explain the decisional process.[3] Cases involving classifications based on alienage,

---

[1] The three standards—"rationally related to a legitimate state interest," "somewhat heightened review," and "strict scrutiny" are briefly described *ante*, at 440, 441.

[2] In *United States Railroad Retirement Board* v. *Fritz*, 449 U. S. 166, 176–177, n. 10 (1980), after citing 11 cases applying the rational-basis standard, the Court stated: "The most arrogant legal scholar would not claim that all of these cases applied a uniform or consistent test under equal protection principles." Commenting on the intermediate standard of review in his dissent in *Craig* v. *Boren*, 429 U. S. 190, 220–221 (1976), JUSTICE REHNQUIST wrote:

"I would think we have had enough difficulty with the two standards of review which our cases have recognized—the norm of 'rational basis,' and the 'compelling state interest' required where a 'suspect classification' is involved—so as to counsel weightily against the insertion of still another 'standard' between those two. How is this Court to divine what objectives are important? How is it to determine whether a particular law is 'substantially' related to the achievement of such objective, rather than related in some other way to its achievement? Both of the phrases used are so diaphanous and elastic as to invite subjective judicial preferences or prejudices relating to particular types of legislation, masquerading as judgments whether such legislation is directed at 'important' objectives or, whether the relationship to those objectives is 'substantial' enough."

[3] Cf. *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 98 (1973) (MARSHALL, J., dissenting, joined by Douglas, J.) (criticizing "the Court's rigidified approach to equal protection analysis").

illegal residency, illegitimacy, gender, age, or—as in this case—mental retardation, do not fit well into sharply defined classifications.

"I am inclined to believe that what has become known as the [tiered] analysis of equal protection claims does not describe a completely logical method of deciding cases, but rather is a method the Court has employed to explain decisions that actually apply a single standard in a reasonably consistent fashion." *Craig* v. *Boren*, 429 U. S. 190, 212 (1976) (STEVENS, J., concurring). In my own approach to these cases, I have always asked myself whether I could find a "rational basis" for the classification at issue. The term "rational," of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class.[4] Thus, the word "rational"—for me at least—includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially.[5]

The rational-basis test, properly understood, adequately explains why a law that deprives a person of the right to vote because his skin has a different pigmentation than that of other voters violates the Equal Protection Clause. It would be utterly irrational to limit the franchise on the basis of height or weight; it is equally invalid to limit it on the basis of skin color. None of these attributes has any bearing at all

---

[4] "I therefore believe that we must discover a correlation between the classification and either the actual purpose of the statute or a legitimate purpose that we may reasonably presume to have motivated an impartial legislature. If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect. If, however, the adverse impact may reasonably be viewed as an acceptable cost of achieving a larger goal, an impartial lawmaker could rationally decide that that cost should be incurred." *United States Railroad Retirement Board* v. *Fritz*, 449 U. S., at 180–181 (STEVENS, J., concurring in judgment).

[5] See *Lehr* v. *Robertson*, 463 U. S. 248, 265 (1983); *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 100 (1976).

on the citizen's willingness or ability to exercise that civil right. We do not need to apply a special standard, or to apply "strict scrutiny," or even "heightened scrutiny," to decide such cases.

In every equal protection case, we have to ask certain basic questions. What class is harmed by the legislation, and has it been subjected to a "tradition of disfavor" by our laws?[6] What is the public purpose that is being served by the law? What is the characteristic of the disadvantaged class that justifies the disparate treatment?[7] In most cases the answer to these questions will tell us whether the statute has a "rational basis." The answers will result in the virtually automatic invalidation of racial classifications and in the validation of most economic classifications, but they will provide differing results in cases involving classifications based on alienage,[8] gender,[9] or illegitimacy.[10] But that is not because we

---

[6] The Court must be especially vigilant in evaluating the rationality of any classification involving a group that has been subjected to a "tradition of disfavor [for] a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification. Habit, rather than analysis, makes it seem acceptable and natural to distinguish between male and female, alien and citizen, legitimate and illegitimate; for too much of our history there was the same inertia in distinguishing between black and white. But that sort of stereotyped reaction may have no rational relationship—other than pure prejudicial discrimination—to the stated purpose for which the classification is being made." *Mathews* v. *Lucas,* 427 U. S. 495, 520–521 (1976) (STEVENS, J., dissenting). See also *New York Transit Authority* v. *Beazer,* 440 U. S. 568, 593 (1979).

[7] See *Foley* v. *Connelie,* 435 U. S. 291, 308 (1978) (STEVENS, J., dissenting).

[8] See *Mathews* v. *Diaz,* 426 U. S. 67, 78–80 (1976); compare *Sugarman* v. *Dougall,* 413 U. S. 634 (1973), and *In re Griffiths,* 413 U. S. 717 (1973), with *Ambach* v. *Norwick,* 441 U. S. 68 (1979), and *Foley* v. *Connelie,* 435 U. S. 291 (1978).

[9] Compare *Reed* v. *Reed,* 404 U. S. 71 (1971), and *Califano* v. *Goldfarb,* 430 U. S. 199 (1977), with *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256 (1979), and *Heckler* v. *Mathews,* 465 U. S. 728 (1984).

[10] Compare *Lalli* v. *Lalli,* 439 U. S. 259 (1978), with *Trimble* v. *Gordon,* 430 U. S. 762 (1977).

apply an "intermediate standard of review" in these cases; rather it is because the characteristics of these groups are sometimes relevant and sometimes irrelevant to a valid public purpose, or, more specifically, to the purpose that the challenged laws purportedly intended to serve.[11]

Every law that places the mentally retarded in a special class is not presumptively irrational. The differences between mentally retarded persons and those with greater mental capacity are obviously relevant to certain legislative decisions. An impartial lawmaker—indeed, even a member of a class of persons defined as mentally retarded—could rationally vote in favor of a law providing funds for special education and special treatment for the mentally retarded. A mentally retarded person could also recognize that he is a member of a class that might need special supervision in some situations, both to protect himself and to protect others. Restrictions on his right to drive cars or to operate hazardous equipment might well seem rational even though they deprived him of employment opportunities and the kind of freedom of travel enjoyed by other citizens. "That a civilized and decent society expects and approves such legislation indicates that governmental consideration of those differences in the vast majority of situations is not only legitimate but also desirable." *Ante*, at 444.

Even so, the Court of Appeals correctly observed that through ignorance and prejudice the mentally retarded "have been subjected to a history of unfair and often grotesque mistreatment." 726 F. 2d 191, 197 (CA5 1984). The dis-

---

[11] See *Michael M.* v. *Superior Court of Sonoma County*, 450 U. S. 464, 497–498, and n. 4 (1981) (STEVENS, J., dissenting). See also *Caban* v. *Mohammed*, 441 U. S. 380, 406–407 (1979) (STEVENS, J., dissenting) ("But as a matter of equal protection analysis, it is perfectly obvious that at the time and immediately after a child is born out of wedlock, differences between men and women justify some differential treatment of the mother and father in the adoption process").

crimination against the mentally retarded that is at issue in this case is the city's decision to require an annual special use permit before property in an apartment house district may be used as a group home for persons who are mildly retarded. The record convinces me that this permit was required because of the irrational fears of neighboring property owners, rather than for the protection of the mentally retarded persons who would reside in respondent's home.[12]

Although the city argued in the Court of Appeals that legitimate interests of the neighbors justified the restriction, the court unambiguously rejected that argument. *Id.*, at 201. In this Court, the city has argued that the discrimination was really motivated by a desire to protect the mentally retarded from the hazards presented by the neighborhood. Zoning ordinances are not usually justified on any such basis, and in this case, for the reasons explained by the Court, *ante*, at 447–450, I find that justification wholly unconvincing. I cannot believe that a rational member of this disadvantaged class could ever approve of the discriminatory application of the city's ordinance in this case.

Accordingly, I join the opinion of the Court.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, concurring in the judgment in part and dissenting in part.

The Court holds that all retarded individuals cannot be grouped together as the "feebleminded" and deemed presumptively unfit to live in a community. Underlying this holding is the principle that mental retardation *per se* cannot be a proxy for depriving retarded people of their rights and interests without regard to variations in individual ability.

---

[12] In fact, the ordinance provides that each applicant for a special use permit "shall be required to obtain the signatures of the property owners within two hundred (200) feet of the property to be used." App. 63.

With this holding and principle I agree. The Equal Protection Clause requires attention to the capacities and needs of retarded people as individuals.

I cannot agree, however, with the way in which the Court reaches its result or with the narrow, as-applied remedy it provides for the city of Cleburne's equal protection violation. The Court holds the ordinance invalid on rational-basis grounds and disclaims that anything special, in the form of heightened scrutiny, is taking place. Yet Cleburne's ordinance surely would be valid under the traditional rational-basis test applicable to economic and commercial regulation. In my view, it is important to articulate, as the Court does not, the facts and principles that justify subjecting this zoning ordinance to the searching review—the heightened scrutiny—that actually leads to its invalidation. Moreover, in invalidating Cleburne's exclusion of the "feebleminded" only as applied to respondents, rather than on its face, the Court radically departs from our equal protection precedents. Because I dissent from this novel and truncated remedy, and because I cannot accept the Court's disclaimer that no "more exacting standard" than ordinary rational-basis review is being applied, *ante*, at 442, I write separately.

## I

At the outset, two curious and paradoxical aspects of the Court's opinion must be noted. First, because the Court invalidates Cleburne's zoning ordinance on rational-basis grounds, the Court's wide-ranging discussion of heightened scrutiny is wholly superfluous to the decision of this case. This "two for the price of one" approach to constitutional decisionmaking—rendering two constitutional rulings where one is enough to decide the case—stands on their head traditional and deeply embedded principles governing exercise of the Court's Article III power. Just a few weeks ago, the Court "call[ed] to mind two of the cardinal rules governing

the federal courts: 'One, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 501 (1985) (WHITE, J.) (quoting *Liverpool, New York & Philadelphia S.S. Co.* v. *Commissioners of Emigration*, 113 U. S. 33, 39 (1885)).[1] When a lower court correctly decides a case, albeit on what this Court concludes are unnecessary constitutional grounds,[2] "our usual custom" is not to compound the problem by following suit but rather to affirm on the narrower, dispositive ground available. *Alexander* v. *Louisiana*, 405 U. S. 625, 633 (1972).[3] The Court offers no principled justification for departing from these principles, nor, given our equal protection precedents, could it. See *Mississippi University for Women* v. *Hogan*, 458 U. S. 718, 724, n. 9 (1982) (declining to address strict scrutiny when heightened scrutiny sufficient to invalidate action challenged); *Stanton* v. *Stanton*, 421 U. S. 7, 13 (1975)

---

[1] See also *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable"); *Burton* v. *United States*, 196 U. S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case"); see generally *Ashwander* v. *TVA*, 297 U. S. 288, 346–348 (1936) (Brandeis, J., concurring).

Even today, the Court again "calls to mind" these principles, *ante*, at 447, but given the Court's lengthy dicta on heightened scrutiny, this call to principle must be read with some irony.

[2] I do not suggest the lower court erred in relying on heightened scrutiny, for I believe more searching inquiry than the traditional rational-basis test is required to invalidate Cleburne's ordinance. See *infra*, at 458–460.

[3] See also *Three Affiliated Tribes* v. *Wold Engineering*, 467 U. S. 138, 157–158 (1984); *Leroy* v. *Great Western United Corp.*, 443 U. S. 173, 181 (1979).

(same); *Hooper* v. *Bernalillo County Assessor,* 472 U. S. 612, 618 (1985) (declining to reach heightened scrutiny in review of residency-based classifications that fail rational-basis test); *Zobel* v. *Williams,* 457 U. S. 55, 60–61 (1982) (same); cf. *Mitchell* v. *Forsyth,* 472 U. S. 511, 537–538 (1985) (O'CONNOR, J., concurring in part).

Second, the Court's heightened-scrutiny discussion is even more puzzling given that Cleburne's ordinance is invalidated only after being subjected to precisely the sort of probing inquiry associated with heightened scrutiny. To be sure, the Court does not label its handiwork heightened scrutiny, and perhaps the method employed must hereafter be called "second order" rational-basis review rather than "heightened scrutiny." But however labeled, the rational-basis test invoked today is most assuredly not the rational-basis test of *Williamson* v. *Lee Optical of Oklahoma, Inc.,* 348 U. S. 483 (1955); *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522 (1959), and their progeny.

The Court, for example, concludes that legitimate concerns for fire hazards or the serenity of the neighborhood do not justify singling out respondents to bear the burdens of these concerns, for analogous permitted uses appear to pose similar threats. Yet under the traditional and most minimal version of the rational-basis test, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson* v. *Lee Optical of Oklahoma, Inc., supra,* at 489; see *American Federation of Labor* v. *American Sash Co.,* 335 U. S. 538 (1949); *Semler* v. *Dental Examiners,* 294 U. S. 608 (1935). The "record" is said not to support the ordinance's classifications, *ante,* at 448, 450, but under the traditional standard we do not sift through the record to determine whether policy decisions are squarely supported by a firm factual foundation. *Exxon Corp.* v. *Eagerton,* 462 U. S. 176, 196 (1983); *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 461–462,

464 (1981); *Firemen* v. *Chicago, R. I. & P. R. Co.*, 393 U. S. 129, 138–139 (1968). Finally, the Court further finds it "difficult to believe" that the retarded present different or special hazards inapplicable to other groups. In normal circumstances, the burden is not on the legislature to convince the Court that the lines it has drawn are sensible; legislation is presumptively constitutional, and a State "is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference" to its goals. *Allied Stores of Ohio, Inc.* v. *Bowers, supra,* at 527; see *New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976); *Metropolis Theatre Co.* v. *City of Chicago,* 228 U. S. 61, 68–70 (1913).

I share the Court's criticisms of the overly broad lines that Cleburne's zoning ordinance has drawn. But if the ordinance is to be invalidated for its imprecise classifications, it must be pursuant to more powerful scrutiny than the minimal rational-basis test used to review classifications affecting only economic and commercial matters. The same imprecision in a similar ordinance that required opticians but not optometrists to be licensed to practice, see *Williamson* v. *Lee Optical of Oklahoma, Inc., supra,* or that excluded new but not old businesses from parts of a community, see *New Orleans* v. *Dukes, supra,* would hardly be fatal to the statutory scheme.

The refusal to acknowledge that something more than minimum rationality review is at work here is, in my view, unfortunate in at least two respects.[4] The suggestion that

---

[4] The two cases the Court cites in its rational-basis discussion, *Zobel* v. *Williams,* 457 U. S. 55 (1982), and *United States Dept. of Agriculture* v. *Moreno,* 413 U. S. 528 (1973), expose the special nature of the rational-basis test employed today. As two of only a handful of modern equal protection cases striking down legislation under what purports to be a rational-basis standard, these cases must be and generally have been viewed as intermediate review decisions masquerading in rational-basis language. See, *e. g.,* L. Tribe, American Constitutional Law § 16–31,

the traditional rational-basis test allows this sort of searching inquiry creates precedent for this Court and lower courts to subject economic and commercial classifications to similar and searching "ordinary" rational-basis review—a small and regrettable step back toward the days of *Lochner* v. *New York*, 198 U. S. 45 (1905). Moreover, by failing to articulate the factors that justify today's "second order" rational-basis review, the Court provides no principled foundation for determining when more searching inquiry is to be invoked. Lower courts are thus left in the dark on this important question, and this Court remains unaccountable for its decisions employing, or refusing to employ, particularly searching scrutiny. Candor requires me to acknowledge the particular factors that justify invalidating Cleburne's zoning ordinance under the careful scrutiny it today receives.

## II

I have long believed the level of scrutiny employed in an equal protection case should vary with "the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn." *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 99 (1973) (MARSHALL, J., dissenting). See also *Plyler* v. *Doe*, 457 U. S. 202, 230–231 (1982) (MARSHALL, J., concurring); *Dandridge* v. *Williams*, 397 U. S. 471, 508 (1970) (MARSHALL, J., dissenting). When a zoning ordinance works to exclude the retarded from all residential districts in a community, these two considerations require that the ordinance be convincingly justified as substantially furthering legitimate and important purposes. *Plyler, supra; Mississippi University for Women* v. *Hogan*, 458 U. S. 718 (1982); *Frontiero* v. *Richardson*, 411 U. S. 677 (1973); *Mills* v. *Habluetzel*, 456 U. S. 91 (1982); see also *Buchanan* v. *Warley*, 245 U. S. 60 (1917).

---

p. 1090, n. 10 (1978) (discussing *Moreno*); see also *Moreno, supra,* at 538 (Douglas, J., concurring); *Zobel, supra,* at 65 (BRENNAN, J., concurring).

First, the interest of the retarded in establishing group homes is substantial. The right to "establish a home" has long been cherished as one of the fundamental liberties embraced by the Due Process Clause. See *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923). For retarded adults, this right means living together in group homes, for as deinstitutionalization has progressed, group homes have become the primary means by which retarded adults can enter life in the community. The District Court found as a matter of fact that

> "[t]he availability of such a home in communities is an essential ingredient of normal living patterns for persons who are mentally retarded, and each factor that makes such group homes harder to establish operates to exclude persons who are mentally retarded from the community." App. to Pet. for Cert. A–8.

Excluding group homes deprives the retarded of much of what makes for human freedom and fulfillment—the ability to form bonds and take part in the life of a community.[5]

Second, the mentally retarded have been subject to a "lengthy and tragic history," *University of California Regents* v. *Bakke*, 438 U. S. 265, 303 (1978) (opinion of POW-ELL, J.), of segregation and discrimination that can only be called grotesque. During much of the 19th century, mental retardation was viewed as neither curable nor dangerous and the retarded were largely left to their own devices.[6] By the latter part of the century and during the first decades of the new one, however, social views of the retarded underwent a radical transformation. Fueled by the rising tide of Social Darwinism, the "science" of eugenics, and the extreme

---

[5] Indeed, the group home in this case was specifically located near a park, a school, and a shopping center so that its residents would have full access to the community at large.

[6] S. Herr, Rights and Advocacy for Retarded People 18 (1983).

xenophobia of those years,[7] leading medical authorities and others began to portray the "feebleminded" as a "menace to society and civilization . . . responsible in a large degree for many, if not all, of our social problems."[8] A regime of state-mandated segregation and degradation soon emerged that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow. Massive custodial institutions were built to warehouse the retarded for life; the aim was to halt reproduction of the retarded and "nearly extinguish their race."[9] Retarded children were categorically excluded from

---

[7] On the role of these ideologies in this era, see K. Stampp, Era of Reconstruction, 1865–1877, pp. 18–22 (1965).

[8] H. Goddard, The Possibilities of Research as Applied to the Prevention of Feeblemindedness, Proceedings of the National Conference of Charities and Correction 307 (1915), cited in A. Deutsch, The Mentally Ill in America 360 (2d ed. 1949). See also Fernald, The Burden of Feeblemindedness, 17 J. Psycho-Asthenics 87, 90 (1913) (the retarded "cause unutterable sorrow at home and are a menace and danger to the community"); Terman, Feeble-Minded Children in the Public Schools of California, 5 Schools & Society 161 (1917) ("[O]nly recently have we begun to recognize how serious a menace [feeblemindedness] is to the social, economic and moral welfare of the state . . . . [I]t is responsible . . . for the majority of cases of chronic and semi-chronic pauperism, and for much of our alcoholism, prostitution, and venereal diseases"). Books with titles such as "The Menace of the Feeble Minded in Connecticut" (1915), issued by the Connecticut School for Imbeciles, became commonplace. See C. Frazier, (Chairman, Executive Committee of Public Charities Assn. of Pennsylvania), The Menace of the Feeble-Minded In Pennsylvania (1913); W. Fernald, The Burden of Feeble-Mindedness (1912) (Mass.); Juvenile Protection Association of Cincinnati, The Feeble-Minded, Or the Hub to Our Wheel of Vice (1915) (Ohio). The resemblance to such works as R. Shufeldt, The Negro: A Menace to American Civilization (1907), is striking, and not coincidental.

[9] A. Moore, The Feeble-Minded in New York 3 (1911). This book was sponsored by the State Charities Aid Association. See also P. Tyor & L. Bell, Caring for the Retarded in America 71–104 (1984). The segregationist purpose of these laws was clear. See, e. g., Act of Mar. 22, 1915, ch. 90, 1915 Tex. Gen. Laws 143 (repealed 1955) (Act designed to relieve

public schools, based on the false stereotype that all were ineducable and on the purported need to protect nonretarded children from them.[10]    State laws deemed the retarded "unfit for citizenship."[11]

Segregation was accompanied by eugenic marriage and sterilization laws that extinguished for the retarded one of the "basic civil rights of man"—the right to marry and procreate.    *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942).    Marriages of the retarded were made, and in some States continue to be, not only voidable but also often a criminal offense.[12]    The purpose of such limitations, which frequently applied only to women of child-bearing age, was unabashedly eugenic: to prevent the retarded from propagating.[13]    To assure this end, 29 States enacted compulsory eugenic sterilization laws between 1907 and 1931.    J. Landman, Human Sterilization 302–303 (1932).    See *Buck* v. *Bell*, 274 U. S. 200, 207 (1927) (Holmes, J.); cf. *Plessy* v. *Fergu-*

---

society of "the heavy economic and moral losses arising from the existence at large of these unfortunate persons").

[10] See *Pennsylvania Assn. for Retarded Children* v. *Pennsylvania*, 343 F. Supp. 279, 294–295 (ED Pa. 1972); see generally S. Sarason & J. Doris, Educational Handicap, Public Policy, and Social History 271–272 (1979).

[11] Act of Apr. 3, 1920, ch. 210, § 17, 1920 Miss. Laws 288, 294.

[12] See, *e. g.*, Act of Mar. 19, 1928, ch. 156, 1928 Ky. Acts 534, *remains in effect*, Ky. Rev. Stat. § 402.990(2) (1984); Act of May 25, 1905, No. 136, § 1, 1905 Mich. Pub. Acts 185, 186, *remains in effect* Mich. Comp. Laws § 551.6 (1979); Act of Apr. 3, 1920, ch. 210, § 29, 1920 Miss. Gen. Laws 288, 300, *remains in effect* with minor changes, Miss. Code Ann. § 41–21–45 (1972).

[13] See Chamberlain, Current Legislation—Eugenics and Limitations of Marriage, 9 A. B. A. J. 429 (1923); *Lau* v. *Lau*, 81 N. H. 44, 122 A. 345, 346 (1923); *State* v. *Wyman*, 118 Conn. 501, 173 A. 155, 156 (1934).    See generally Linn & Bowers, The Historical Fallacies Behind Legal Prohibitions of Marriages Involving Mentally Retarded Persons—The Eternal Child Grows Up, 13 Gonz. L. Rev. 625 (1978); Shaman, Persons Who Are Mentally Retarded: Their Right to Marry and Have Children, 12 Family L. Q. 61 (1978); Note, The Right of the Mentally Disabled to Marry: A Statutory Evaluation, 15 J. Family L. 463 (1977).

*son*, 163 U. S. 537 (1896); *Bradwell* v. *Illinois*, 16 Wall. 130, 141 (1873) (Bradley, J., concurring in judgment).

Prejudice, once let loose, is not easily cabined. See *University of California Regents* v. *Bakke*, 438 U. S., at 395 (opinion of MARSHALL, J.). As of 1979, most States still categorically disqualified "idiots" from voting, without regard to individual capacity and with discretion to exclude left in the hands of low-level election officials.[14] Not until Congress enacted the Education of the Handicapped Act, 84 Stat. 175, as amended, 20 U. S. C. § 1400 *et seq.*, were "the door[s] of public education" opened wide to handicapped children. *Hendrick Hudson District Board of Education* v. *Rowley*, 458 U. S. 176, 192 (1982).[15] But most important, lengthy and continuing isolation of the retarded has perpetuated the ignorance, irrational fears, and stereotyping that long have plagued them.[16]

In light of the importance of the interest at stake and the history of discrimination the retarded have suffered, the Equal Protection Clause requires us to do more than review the distinctions drawn by Cleburne's zoning ordinance as if they appeared in a taxing statute or in economic or commercial legislation.[17] The searching scrutiny I would give to re-

---

[14] See Note, Mental Disability and the Right to Vote, 88 Yale L. J. 1644 (1979).

[15] Congress expressly found that most handicapped children, including the retarded, were simply shut out from the public school system. See 20 U. S. C. § 1400(b).

[16] See generally G. Allport, The Nature of Prejudice (1958) (separateness among groups exaggerates differences).

[17] This history of discrimination may well be directly relevant to the issue before the Court. Cleburne's current exclusion of the "feeble-minded" in its 1965 zoning ordinance appeared as a similar exclusion of the "feeble-minded" in the city's 1947 ordinance, see Act of Sept. 26, 1947, § 5; the latter tracked word for word a similar exclusion in the 1929 comprehensive zoning ordinance for the nearby city of Dallas. See Dallas Ordinance, No. 2052, § 4, passed Sept. 11, 1929.

Although we have been presented with no legislative history for Cleburne's zoning ordinances, this genealogy strongly suggests that Cle-

strictions on the ability of the retarded to establish community group homes leads me to conclude that Cleburne's vague generalizations for classifying the "feeble-minded" with drug addicts, alcoholics, and the insane, and excluding them where the elderly, the ill, the boarder, and the transient are allowed, are not substantial or important enough to overcome the suspicion that the ordinance rests on impermissible assumptions or outmoded and perhaps invidious stereotypes. See *Plyler* v. *Doe*, 457 U. S. 202 (1982); *Roberts* v. *United States Jaycees*, 468 U. S. 609 (1984); *Mississippi University for Women* v. *Hogan*, 458 U. S. 718 (1982); *Mills* v. *Habluetzel*, 456 U. S. 91 (1982).

## III

In its effort to show that Cleburne's ordinance can be struck down under no "more exacting standard . . . than is normally accorded economic and social legislation," *ante*, at 442, the Court offers several justifications as to why the retarded do not warrant heightened judicial solicitude. These justifications, however, find no support in our heightened-scrutiny precedents and cannot withstand logical analysis.

The Court downplays the lengthy "history of purposeful unequal treatment" of the retarded, see *San Antonio Independent School District* v. *Rodriguez*, 411 U. S., at 28, by pointing to recent legislative action that is said to "beli[e] a continuing antipathy or prejudice." *Ante*, at 443. Building on this point, the Court similarly concludes that the retarded

---

burne's current exclusion of the "feeble-minded" was written in the darkest days of segregation and stigmatization of the retarded and simply carried over to the current ordinance. Recently we held that extant laws originally motivated by a discriminatory purpose continue to violate the Equal Protection Clause, even if they would be permissible were they reenacted without a discriminatory motive. See *Hunter* v. *Underwood*, 471 U. S. 222, 233 (1985). But in any event, the roots of a law that by its terms excludes from a community the "feebleminded" are clear. As the examples above attest, see n. 7, *supra*, "feebleminded" was the defining term for all retarded people in the era of overt and pervasive discrimination.

are not "politically powerless" and deserve no greater judicial protection than "[a]ny minority" that wins some political battles and loses others. *Ante*, at 445. The import of these conclusions, it seems, is that the only discrimination courts may remedy is the discrimination they alone are perspicacious enough to see. Once society begins to recognize certain practices as discriminatory, in part because previously stigmatized groups have mobilized politically to lift this stigma, the Court would refrain from approaching such practices with the added skepticism of heightened scrutiny.

Courts, however, do not sit or act in a social vacuum. Moral philosophers may debate whether certain inequalities are absolute wrongs, but history makes clear that constitutional principles of equality, like constitutional principles of liberty, property, and due process, evolve over time; what once was a "natural" and "self-evident" ordering later comes to be seen as an artificial and invidious constraint on human potential and freedom. Compare *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), and *Bradwell* v. *Illinois*, *supra*, at 141 (Bradley, J., concurring in judgment), with *Brown* v. *Board of Education*, 347 U. S. 483 (1954), and *Reed* v. *Reed*, 404 U. S. 71 (1971). Shifting cultural, political, and social patterns at times come to make past practices appear inconsistent with fundamental principles upon which American society rests, an inconsistency legally cognizable under the Equal Protection Clause. It is natural that evolving standards of equality come to be embodied in legislation. When that occurs, courts should look to the fact of such change as a source of guidance on evolving principles of equality. In an analysis the Court today ignores, the Court reached this very conclusion when it extended heightened scrutiny to gender classifications and drew on parallel legislative developments to support that extension:

> "[O]ver the past decade, Congress has itself manifested an increasing sensitivity to sex-based classifi-

cations [citing examples]. Thus, Congress itself has concluded that classifications based upon sex are inherently invidious, and this conclusion of a coequal branch of Government is not without significance to the question presently under consideration." *Frontiero* v. *Richardson*, 411 U. S., at 687.[18]

Moreover, even when judicial action *has* catalyzed legislative change, that change certainly does not eviscerate the underlying constitutional principle. The Court, for example, has never suggested that race-based classifications became any less suspect once extensive legislation had been enacted on the subject. See *Palmore* v. *Sidoti*, 466 U. S. 429 (1984).

For the retarded, just as for Negroes and women, much has changed in recent years, but much remains the same; outdated statutes are still on the books, and irrational fears or ignorance, traceable to the prolonged social and cultural isolation of the retarded, continue to stymie recognition of the dignity and individuality of retarded people. Heightened judicial scrutiny of action appearing to impose unnecessary barriers to the retarded is required in light of increasing recognition that such barriers are inconsistent with evolving principles of equality embedded in the Fourteenth Amendment.

The Court also offers a more general view of heightened scrutiny, a view focused primarily on when heightened scrutiny does *not* apply as opposed to when it does apply.[19] Two

---

[18] Although *Frontiero* was a plurality opinion, it is now well established that gender classifications receive heightened scrutiny. See, *e. g.*, *Mississippi University for Women* v. *Hogan*, 458 U. S. 718 (1982).

[19] For its general theories about heightened scrutiny, the Court relies heavily, indeed virtually exclusively, on the "lesson" of *Massachusetts Board of Retirement* v. *Murgia*, 427 U. S. 307 (1976). The brief *per curiam* in *Murgia*, however, was handed down in the days before the Court explicitly acknowledged the existence of heightened scrutiny. See *Craig* v. *Boren*, 429 U. S. 190 (1976); *id.*, at 210 (POWELL, J., concurring). *Murgia* explains why age-based distinctions do not trigger strict scrutiny,

principles appear central to the Court's theory. First, heightened scrutiny is said to be inapplicable where *individuals* in a group have distinguishing characteristics that legislatures properly may take into account in some circumstances. *Ante*, at 441–442. Heightened scrutiny is also purportedly inappropriate when many legislative classifications affecting the *group* are likely to be valid. We must, so the Court says, "look to the likelihood that governmental action premised on a particular classification is valid as a general matter, not merely to the specifics of the case before us," in deciding whether to apply heightened scrutiny. *Ante*, at 446.

If the Court's first principle were sound, heightened scrutiny would have to await a day when people could be cut from a cookie mold. Women are hardly alike in all their characteristics, but heightened scrutiny applies to them because legislatures can rarely use gender itself as a proxy for these other characteristics. Permissible distinctions between persons must bear a reasonable relationship to their *relevant* characteristics, *Zobel* v. *Williams*, 457 U. S., at 70 (BRENNAN, J., concurring), and gender *per se* is almost never relevant. Similarly, that some retarded people have reduced capacities in some areas does not justify using retardation as a proxy for reduced capacity in areas where relevant individual variations in capacity do exist.

The Court's second assertion—that the standard of review must be fixed with reference to the number of classifications to which a characteristic would validly be relevant—is similarly flawed. Certainly the assertion is not a logical one; that a characteristic may be relevant under some or even many circumstances does not suggest any reason to presume it relevant under other circumstances where there is reason to suspect it is not. A sign that says "men only" looks very

---

but says nothing about whether such distinctions warrant heightened scrutiny. Nor have subsequent cases addressed this issue. See *Vance* v. *Bradley*, 440 U. S. 93, 97 (1979).

different on a bathroom door than a courthouse door. But see *Bradwell* v. *Illinois,* 16 Wall. 130 (1873).

Our heightened-scrutiny precedents belie the claim that a characteristic must virtually always be irrelevant to warrant heightened scrutiny. *Plyler,* for example, held that the status of being an undocumented alien is not a "constitutional irrelevancy," and therefore declined to review with strict scrutiny classifications affecting undocumented aliens. 457 U. S., at 219, n. 19. While *Frontiero* stated that gender "frequently" and "often" bears no relation to legitimate legislative aims, it did not deem gender an impermissible basis of state action in all circumstances. 411 U. S., at 686–687. Indeed, the Court has upheld some gender-based classifications. *Rostker* v. *Goldberg,* 453 U. S. 57 (1981); *Michael M.* v. *Superior Court of Sonoma County,* 450 U. S. 464 (1981). Heightened but not strict scrutiny is considered appropriate in areas such as gender, illegitimacy, or alienage[20] because the Court views the trait as relevant under some circumstances but not others.[21] That view—indeed the very concept of heightened, as opposed to strict, scrutiny—is flatly inconsistent with the notion that heightened scrutiny should not apply to the retarded because "mental retardation is a characteristic that the government may legitimately take into account in a wide range of decisions." *Ante,* at 446. Because the government also may not take this characteristic into account in many circumstances, such as those presented here, careful review is required to separate the permissible from the invalid in classifications relying on retardation.

---

[20] Alienage classifications present a related variant, for strict scrutiny is applied to such classifications in the economic and social area, but only heightened scrutiny is applied when the classification relates to "political functions." *Cabell* v. *Chavez-Salido,* 454 U. S. 432, 439 (1982); see also *Bernal* v. *Fainter,* 467 U. S. 216, 220–222 (1984). Thus, characterization of the area to which an alienage classification applies is necessary to determine how strongly it must be justified.

[21] I express no view here as to whether strict scrutiny ought to be extended to these classifications.

The fact that retardation may be deemed a constitutional irrelevancy in *some* circumstances is enough, given the history of discrimination the retarded have suffered, to require careful judicial review of classifications singling out the retarded for special burdens. Although the Court acknowledges that many instances of invidious discrimination against the retarded still exist, the Court boldly asserts that "in the vast majority of situations" special treatment of the retarded is "not only legitimate but also desirable." *Ante*, at 444. That assertion suggests the Court would somehow have us calculate the percentage of "situations" in which a characteristic is validly and invalidly invoked before determining whether heightened scrutiny is appropriate. But heightened scrutiny has not been "triggered" in our past cases only after some undefined numerical threshold of invalid "situations" has been crossed. An inquiry into constitutional principle, not mathematics, determines whether heightened scrutiny is appropriate. Whenever evolving principles of equality, rooted in the Equal Protection Clause, require that certain classifications be viewed as *potentially* discriminatory, and when history reveals systemic unequal treatment, more searching judicial inquiry than minimum rationality becomes relevant.

Potentially discriminatory classifications exist only where some constitutional basis can be found for presuming that equal rights are required. Discrimination, in the Fourteenth Amendment sense, connotes a substantive constitutional judgment that two individuals or groups are entitled to be treated equally with respect to something. With regard to economic and commercial matters, no basis for such a conclusion exists, for as Justice Holmes urged the *Lochner* Court, the Fourteenth Amendment was not "intended to embody a particular economic theory . . . ." *Lochner* v. *New York*, 198 U. S., at 75 (dissenting). As a matter of substantive policy, therefore, government is free to move in any

direction, or to change directions,[22] in the economic and commercial sphere.[23]   The structure of economic and commercial life is a matter of political compromise, not constitutional principle, and no norm of equality requires that there be as many opticians as optometrists, see *Williamson* v. *Lee Optical of Oklahoma, Inc.*, 348 U. S. 483 (1955), or new businesses as old, see *New Orleans* v. *Dukes*, 427 U. S. 297 (1976).

But the Fourteenth Amendment does prohibit other results under virtually all circumstances, such as castes created by law along racial or ethnic lines, see *Palmore* v. *Sidoti*, 466 U. S., at 432–433; *Loving* v. *Virginia*, 388 U. S. 1 (1967); *McLaughlin* v. *Florida*, 379 U. S. 184 (1964); *Shelley* v. *Kraemer*, 334 U. S. 1, 23 (1948); *Hernandez* v. *Texas*, 347 U. S. 475 (1954), and significantly constrains the range of permissible government choices where gender or illegitimacy, for example, are concerned.   Where such constraints, derived from the Fourteenth Amendment, are present, and where history teaches that they have systemically been ignored, a "more searching judicial inquiry" is required.   *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938).

That more searching inquiry, be it called heightened scrutiny or "second order" rational-basis review, is a method of

---

[22] Constitutional provisions other than the Equal Protection Clause, such as the Contracts Clause, the Just Compensation Clause, or the Due Process Clause, may constrain the extent to which government can upset settled expectations when changing course and the process by which it must implement such changes.

[23] Only when it can be said that "Congress misapprehended what it was doing," *United States Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 193 (1980) (BRENNAN, J., dissenting), will a classification fail the minimal rational-basis standard.   Even then, the classification fails not because of limits on the directions which substantive policy can take in the economic and commercial area, but because the classification reflects *no* underlying substantive policy—it is simply arbitrary.

approaching certain classifications skeptically, with judgment suspended until the facts are in and the evidence considered. The government must establish that the classification is substantially related to important and legitimate objectives, see, *e. g., Craig* v. *Boren*, 429 U. S. 190 (1976), so that valid and sufficiently weighty policies actually justify the departure from equality. Heightened scrutiny does not allow courts to second-guess reasoned legislative or professional judgments tailored to the unique needs of a group like the retarded, but it does seek to assure that the hostility or thoughtlessness with which there is reason to be concerned has not carried the day. By invoking heightened scrutiny, the Court recognizes, and compels lower courts to recognize, that a group may well be the target of the sort of prejudiced, thoughtless, or stereotyped action that offends principles of equality found in the Fourteenth Amendment. Where classifications based on a particular characteristic have done so in the past, and the threat that they may do so remains, heightened scrutiny is appropriate.[24]

---

[24] No single talisman can define those groups likely to be the target of classifications offensive to the Fourteenth Amendment and therefore warranting heightened or strict scrutiny; experience, not abstract logic, must be the primary guide. The "political powerlessness" of a group may be relevant, *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 28 (1973), but that factor is neither necessary, as the gender cases demonstrate, nor sufficient, as the example of minors illustrates. Minors cannot vote and thus might be considered politically powerless to an extreme degree. Nonetheless, we see few statutes reflecting prejudice or indifference to minors, and I am not aware of any suggestion that legislation affecting them be viewed with the suspicion of heightened scrutiny. Similarly, immutability of the trait at issue may be relevant, but many immutable characteristics, such as height or blindness, are valid bases of governmental action and classifications under a variety of circumstances. See *ante*, at 442–443, n. 10.

The political powerlessness of a group and the immutability of its defining trait are relevant insofar as they point to a social and cultural isolation that gives the majority little reason to respect or be concerned with that group's interests and needs. Statutes discriminating against the young

As the history of discrimination against the retarded and its continuing legacy amply attest, the mentally retarded have been, and in some areas may still be, the targets of action the Equal Protection Clause condemns.  With respect to a liberty so valued as the right to establish a home in the community, and so likely to be denied on the basis of irrational fears and outright hostility, heightened scrutiny is surely appropriate.

## IV

In light of the scrutiny that should be applied here, Cleburne's ordinance sweeps too broadly to dispel the suspicion that it rests on a bare desire to treat the retarded as outsiders, pariahs who do not belong in the community.  The Court, while disclaiming that special scrutiny is necessary or warranted, reaches the same conclusion.  Rather than striking the ordinance down, however, the Court invalidates it merely as applied to respondents.  I must dissent from the novel proposition that "the preferred course of adjudication"

---

have not been common nor need be feared because those who do vote and legislate were once themselves young, typically have children of their own, and certainly interact regularly with minors.  Their social integration means that minors, unlike discrete and insular minorities, tend to be treated in legislative arenas with full concern and respect, despite their formal and complete exclusion from the electoral process.

The discreteness and insularity warranting a "more searching judicial inquiry," *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938), must therefore be viewed from a social and cultural perspective as well as a political one.  To this task judges are well suited, for the lessons of history and experience are surely the best guide as to when, and with respect to what interests, society is likely to stigmatize individuals as members of an inferior caste or view them as not belonging to the community.  Because prejudice spawns prejudice, and stereotypes produce limitations that confirm the stereotype on which they are based, a history of unequal treatment requires sensitivity to the prospect that its vestiges endure.  In separating those groups that are discrete and insular from those that are not, as in many important legal distinctions, "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 349 (1921) (Holmes, J.).

is to leave standing a legislative Act resting on "irrational prejudice" *ante*, at 450, thereby forcing individuals in the group discriminated against to continue to run the Act's gauntlet.

The Court appears to act out of a belief that the ordinance might be "rational" as applied to some subgroup of the retarded under some circumstances, such as those utterly without the capacity to live in a community, and that the ordinance should not be invalidated *in toto* if it is capable of ever being validly applied. But the issue is not "whether the city may never insist on a special use permit for the mentally retarded in an R–3 zone." *Ante*, at 447. The issue is whether the city may require a permit pursuant to a blunder-buss ordinance drafted many years ago to exclude all the "feeble-minded," or whether the city must enact a new ordinance carefully tailored to the exclusion of some well-defined subgroup of retarded people in circumstances in which exclusion might reasonably further legitimate city purposes.

By leaving the sweeping exclusion of the "feebleminded" to be applied to other groups of the retarded, the Court has created peculiar problems for the future. The Court does not define the relevant characteristics of respondents or their proposed home that make it unlawful to require them to seek a special permit. Nor does the Court delineate any principle that defines to which, if any, set of retarded people the ordinance *might* validly be applied. Cleburne's City Council and retarded applicants are left without guidance as to the potentially valid, and invalid, applications of the ordinance. As a consequence, the Court's as-applied remedy relegates future retarded applicants to the standardless discretion of low-level officials who have already shown an all too willing readiness to be captured by the "vague, undifferentiated fears," *ante*, at 449, of ignorant or frightened residents.

Invalidating on its face the ordinance's special treatment of the "feeble-minded," in contrast, would place the responsibility for tailoring and updating Cleburne's unconstitutional

ordinance where it belongs: with the legislative arm of the city of Cleburne.    If Cleburne perceives a legitimate need for requiring a certain well-defined subgroup of the retarded to obtain special permits before establishing group homes, Cleburne will, after studying the problem and making the appropriate policy decisions, enact a new, more narrowly tailored ordinance.    That ordinance might well look very different from the current one; it might separate group homes (presently treated nowhere in the ordinance) from hospitals, and it might define a narrow subclass of the retarded for whom even group homes could legitimately be excluded. Special treatment of the retarded might be ended altogether. But whatever the contours such an ordinance might take, the city should not be allowed to keep its ordinance on the books intact and thereby shift to the courts the responsibility to confront the complex empirical and policy questions involved in updating statutes affecting the mentally retarded.    A legislative solution would yield standards and provide the sort of certainty to retarded applicants and administrative officials that case-by-case judicial rulings cannot provide.    Retarded applicants should not have to continue to attempt to surmount Cleburne's vastly overbroad ordinance.

The Court's as-applied approach might be more defensible under circumstances very different from those presented here.    Were the ordinance capable of being cleanly severed, in one judicial cut, into its permissible and impermissible applications, the problems I have pointed out would be greatly reduced.    Cf. *United States* v. *Grace,* 461 U. S. 171 (1983) (statute restricting speech and conduct in Supreme Court building and on its grounds invalid as applied to sidewalks); but cf. *id.,* at 184–188 (opinion concurring in part and dissenting in part).    But no readily apparent construction appears, nor has the Court offered one, to define which group of retarded people the city might validly require a permit of, and which it might not, in the R–3 zone.    The Court's as-applied holding is particularly inappropriate here,

for nine-tenths of the group covered by the statute appears similarly situated to respondents, see *ante*, at 442, n. 9— a figure that makes the statutory presumption enormously overbroad. Cf. *Stanley* v. *Illinois*, 405 U. S. 645 (1972) (invalidating statutory presumption despite State's insistence that it validly applied to "most" of those covered).

To my knowledge, the Court has never before treated an equal protection challenge to a statute on an as-applied basis. When statutes rest on impermissibly overbroad generalizations, our cases have invalidated the presumption on its face.[25] We do not instead leave to the courts the task of redrafting the statute through an ongoing and cumbersome process of "as applied" constitutional rulings. In *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632 (1974), for

---

[25] The Court strongly suggests that the loose fit of the ordinance to its purported objectives signifies that the ordinance rests on "an irrational prejudice," *ante*, at 450, an unconstitutional legislative purpose. See *Mississippi University for Women* v. *Hogan*, 458 U. S., at 725. In that event, recent precedent should make clear that the ordinance must, in its entirety, be invalidated. See *Hunter* v. *Underwood*, 471 U. S. 222 (1985). *Hunter* involved a 1902 constitutional provision disenfranchising various felons. Because that provision had been motivated, at least in part, by a desire to disenfranchise Negroes, we invalidated it on its face. In doing so, we did not suggest that felons could not be deprived of the vote through a statute motivated by some purpose other than racial discrimination. See *Richardson* v. *Ramirez*, 418 U. S. 24 (1974). Yet that possibility, or the possibility that the provision might have been only partly motivated by the desire to disenfranchise Negroes, did not suggest the provision should be invalidated only "as applied" to the particular plaintiffs in *Hunter* or even as applied to Negroes more generally. Instead we concluded:

"Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights* [v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977)]." 471 U. S., at 233.

If a discriminatory purpose infects a legislative Act, the Act itself is inconsistent with the Equal Protection Clause and cannot validly be applied to anyone.

example, we invalidated, *inter alia*, a maternity leave policy that required pregnant schoolteachers to take unpaid leave beginning five months before their expected due date. The school board argued that some teachers became physically incapable of performing adequately in the latter stages of their pregnancy, and we accepted this justification for purposes of our decision. Assuming the policy might validly be applied to some teachers, particularly in the last few weeks of their pregnancy, *id.*, at 647, n. 13, we nonetheless invalidated it *in toto*, rather than simply as applied to the particular plaintiff. The Court required school boards to employ "alternative administrative means" to achieve their legitimate health and safety goal, *id.*, at 647, or the legislature to enact a more carefully tailored statute, *id.*, at 647, n. 13.

Similarly, *Caban* v. *Mohammed*, 441 U. S. 380 (1979), invalidated a law that required parental consent to adoption from unwed mothers but not from unwed fathers. This distinction was defended on the ground, *inter alia*, that unwed fathers were often more difficult to locate, particularly during a child's infancy. We suggested the legislature might make proof of abandonment easier or proof of paternity harder, but we required the legislature to draft a new statute tailored more precisely to the problem of locating unwed fathers. The statute was not left on the books by invalidating it only as applied to unwed fathers who actually proved they could be located. When a presumption is unconstitutionally overbroad, the preferred course of adjudication is to strike it down. See also *United States Dept. of Agriculture* v. *Moreno*, 413 U. S. 528 (1973); *Stanley* v. *Illinois, supra; Vlandis* v. *Kline*, 412 U. S. 441, 453–454 (1973); *Carrington* v. *Rash*, 380 U. S. 89 (1965); *Sugarman* v. *Dougall*, 413 U. S. 634, 646–649 (1973); *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164 (1972); *Levy* v. *Louisiana*, 391 U. S. 68 (1968).

In my view, the Court's remedial approach is both unprecedented in the equal protection area and unwise. This doc-

trinal change of course was not sought by the parties, suggested by the various *amici*, or discussed at oral argument. Moreover, the Court does not persuasively reason its way to its novel remedial holding nor reconsider our prior cases directly on point. Instead, the Court simply asserts that "this is the preferred course of adjudication." Given that this assertion emerges only from today's decision, one can only hope it will not become entrenched in the law without fuller consideration.

V

The Court's opinion approaches the task of principled equal protection adjudication in what I view as precisely the wrong way. The formal label under which an equal protection claim is reviewed is less important than careful identification of the interest at stake and the extent to which society recognizes the classification as an invidious one. Yet in focusing obsessively on the appropriate label to give its standard of review, the Court fails to identify the interests at stake or to articulate the principle that classifications based on mental retardation must be carefully examined to assure they do not rest on impermissible assumptions or false stereotypes regarding individual ability and need. No guidance is thereby given as to when the Court's freewheeling, and potentially dangerous, "rational-basis standard" is to be employed, nor is attention directed to the invidiousness of grouping all retarded individuals together. Moreover, the Court's narrow, as-applied remedy fails to deal adequately with the overbroad presumption that lies at the heart of this case. Rather than leaving future retarded individuals to run the gauntlet of this overbroad presumption, I would affirm the judgment of the Court of Appeals in its entirety and would strike down on its face the provision at issue. I therefore concur in the judgment in part and dissent in part.