**Richard KARP, Plaintiff,**

v.

**THE FAIR STORE, INC., and Gerald F. Klein, Defendants.**

**Civ. A. No. B–87–1403–CA.**

United States District Court,
E.D. Texas,
Beaumont Division.

Dec. 15, 1988.

---

John D. Stone and Patricia A. Stone, Beaumont, Tex., for plaintiff.

George Michael Jamail and Marcy Lynn Rothman, Beaumont, Tex., for defendants.

## MEMORANDUM OPINION

HALL, District Judge.

This is a wrongful discharge action brought by Richard Karp against The Fair, Inc. and Gerald Klein. Karp alleges that on March 28, 1986, he was improperly terminated from his employment at The Fair through its president, Gerald Klein. The suit against The Fair is brought on theories of breach of express covenant of good faith and fair dealing and sex discrimination in employment, and against Klein on theories of prima facie tort, negligence, and intentional infliction of emotional distress. Trial to the Court commenced on October 18, 1988.

Karp testified that he held several executive positions at other stores prior to being hired by The Fair. He was known in the business community as a "turn-around man," which he explained was a name to describe a person capable of bringing success to an ailing company in an unfavorable economic climate. In mid–1983, The Fair sought to employ Karp, and Karp travelled to Beaumont for a pre-employment interview with Klein. Karp brought with him a typewritten list of matters to be discussed at the interview, and during the interview he made several handwritten notes on the face of the list.

Karp testified he made it clear during the interview that job security was important to him. Klein nevertheless told him that no written employment contract was needed, but that Klein would deal with him in "good faith" and would only fire him for "just cause." Klein also stated that if Karp were terminated, the reasons for the termination would be provided. The parties agreed to an annual salary of $125,000 plus $5,000 for expenses. Karp testified that Klein promised him equity in the company, and Karp's notes of the interview state "[Klein] would give me small % of Fair stock in order to keep me for the long haul when he buys [the other major stockholder] out." Karp stated that he would not have agreed to the employment if he had not been promised an equity position.

In the fall of 1983, Karp was employed, without a written employment contract, as Senior Executive Vice President of The Fair. In this capacity he was directly responsible for helping the business to earn a profit. When he joined the organization he did not believe the bad economic times would end soon, and accordingly believed that an increase in sales was not viable. He therefore sought to improve the company's performance by cutting expenses. He testified that through 1984 retained earnings and stockholders' equity increased, and that thereafter despite losses in sales he kept bottom line losses to a minimum.

Karp had known Hurst prior to his employment at The Fair, and after he began his employment he brought her qualifica-

tions to the attention of the company. She was hired by the company as a buyer in September of 1983. She was promoted three times during her period of employment, and at least one of these promotions was approved in part by Karp. Karp testified that he had a friendly relationship with Hurst when she arrived at the company, but that the relationship became romantic late in 1985. He stated that he and Hurst spent the night together during a buying trip in 1986, but denied ever engaging in any "publicly reprehensible conduct" with Hurst on an airplane. He stated that he never gave Hurst any preferential treatment at the company, and was aware of no company rules forbidding a private, romantic relationship between employees.

On March 28, 1986, Karp went to the office early and was told that Klein wanted to meet with him. No urgency of any kind was communicated, and Karp therefore left to visit the proposed site of a new store. He called in from the site and again was told that Klein wanted to meet with him. He returned to the office and was told by the Vice President of Personnel that he was being fired for immoral conduct. Klein never spoke directly to Karp on the matter, and Karp was given no warning that his job was in jeopardy. Hurst's employment was terminated the same day.

Karp filed a claim for unemployment benefits with the Texas Employment Commission. The Fair filed an "employer response" which gave as the reason for termination "violation of company policy" and made reference to the company's "Rules of Conduct." Karp spoke with the Vice President of Personnel and requested a copy of the Rules. The Rules which Karp received were titled "Associate Rules of Conduct," and "immoral conduct" is listed among the violations warranting immediate dismissal. Karp testified that references to time cards in the rules indicated that the rules did not govern the conduct of executives, but rather hourly employees such as sales associates.

In the time ensuing between the termination and trial, the company offered various reasons for the termination. At one time the company grounded the termination on "insubordination" and in particular on the failure of Karp to attend the March 28, 1986 meeting with Klein. The company later asserted that the termination was based on poor performance by Karp, citing a drop in sales and gross margin. Karp testified that during his tenure with the company he had various substantive disagreements with other executives, but that he believed he performed outstandingly given the state of the economy.

Klein testified that Karp was hired in 1983 as a "turn-around man." Karp had asked for a written contract at the initial interview, but Klein declined to give him one. Klein stated at trial that outside of one current president and CEO, no one at The Fair worked under an employment contract. Klein also explained that Karp was under no contractual restraint, but did recall telling Karp that The Fair deals with its employees in "good faith." Klein denied ever promising Karp any equity in the company.

Klein further testified that the moral image of the company was important. The Fair was a 75-year old family business, and the base community was small. Klein began to hear rumors about Karp, and had several conversations with him regarding his conduct. Klein told Karp that three things would result in Karp's immediate termination: bad credit, fooling around with fellow employees, and stealing. Klein believed that Karp's employment began well, but that Karp's credibility at the company eroded on account of the rumors concerning his relationship with Hurst.

Although the company never performed any written evaluation of Karp, Klein stated that he initially intended to fire Karp for poor performance. On March 28 Klein asked a lower executive to tell Karp to come to Klein's office. When Karp did not come, Klein drove to both Karp's and Hurst's homes. He observed Hurst's car parked at Karp's home, and became angry. He testified that on that day, after visiting Karp's home and after Karp's failure to attend the meeting, he decided to terminate Karp for immoral conduct and insubor-

dination. He made the decision to fire Hurst the same day.

Klein asserted that the fact that Karp was a male, and Hurst a female, had nothing to do with his termination decisions. No policies at The Fair discriminated against Karp because he was a male. Klein admitted he had heard rumors that one of the senior executive officers was a practicing homosexual, but did not know the truth of the matter.

Gary Ditman worked under Karp in 1984 and 1985. He testified that he dealt with the buyers and knew Hurst, and that he heard rumors about Karp's relationship with Hurst. Ditman believed that Hurst was receiving preferential treatment at the company, and received complaints about Karp and Hurst. During a buying trip Ditman testified that he observed Karp and Hurst "doing something sexual together" on the airplane, that Hurst was "doing something to Mr. Karp." He discussed this incident with Klein, but not with Karp.

Bob Kocot, the Chief Financial Officer at The Fair, testified regarding Karp's job performance. Kocot believed that Karp did not leave the company any better than he found it, and that if Karp's policies had continued, gross margin would have continued to suffer. Kocot also testified he was aware that another executive was a homosexual, and that the executive had appeared at a party openly accompanied by his *socius aberrans.*

The Court first turns to the claims brought against The Fair. Karp alleges he was discriminated against on the basis of his gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Specifically, Karp states that no company policy prohibited fraternization among employees of the same gender, but only among employees of the opposite gender; had Karp been a member of the same gender as Hurst, he would not have been fired. The allegations present some conceptual difficulties at the outset. Karp's proposed gender-based classification is not grounded on his distinction in being male rather than female, but in being of a different gender rather than of the same gender

as Hurst. As such, the allegations appear to be directed more at a classification that is "orientation based" than gender based. Nevertheless, to the extent Karp alleges he would not have been fired had he been female, his complaint appears to raise an injury suffered by virtue of his gender, and therefore deserves closer analysis.

In a Title VII case, the plaintiff has the ultimate burden of proving that the defendant intentionally discriminated against him. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). "[I]t is the plaintiff's task to demonstrate that *similarly situated* employees were not treated equally." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). (emphasis supplied). *See also United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) ("Respondent has failed to allege that United's seniority system differentiates between *similarly situated* males and females on the basis of sex.") (emphasis supplied). The requirement that the categories of employees upon which the gender-based classification is imposed be "similarly situated" derives from the Equal Protection Clause of the Fourteenth Amendment, which the Supreme Court has read as "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

Karp's claim for sexual discrimination must fail because he has not proven that he was treated unequally as against similarly situated employees. Karp bases his claim on the unequal treatment of two categories of employees: employees who fraternize socially with co-employees of the same sex, and employees who fraternize sexually with co-employees of the opposite sex. Karp and his counsel sought to gloss over the social/sexual distinction at trial by using the word "associate." Employees who fraternize socially and those who do so sexually, however, are not similarly situated for purposes of the present gender

discrimination analysis. Among the proffered reasons for the termination the company stated that it was against company policy to "fool around with fellow employees." None of Karp's proof seriously challenges this explanation; Karp has not proven by a preponderance of the evidence that he was fired for "associating" rather than being romantically involved with a fellow employee. Evidence that the company retained an executive who was a practicing homosexual certainly leans toward Karp's theory, but there is no evidence that the homosexual executive "fooled around" with fellow employees against company policy. Further, even if such proof existed, a single incident regarding a single individual would not suffice to support a finding of unequal treatment in this case. The Court is therefore of the opinion that relief based on alleged sex discrimination should be denied.

■ Karp next claims that The Fair breached an express covenant of good faith and fair dealing and fired him without just cause. Karp's counsel stated at trial that he recognized Texas law did not presently provide for recovery for breach of such an express covenant in an employment context. The general rule in Texas is that, absent a specific contract term to the contrary, either the employer or the employee may terminate the employment relationship at any time and for any reason without liability. *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 336 (Tex.App.—Dallas 1986, no writ). The rule is, of course, subject to many legislative and judicial exceptions. *See McClendon v. Ingersoll–Rand Co.*, 757 S.W.2d 816, 818 (Tex.App.—Houston [14th Dist.] 1988, no writ). No case, however, has been brought to the Court's attention which creates an exception for employment contracts of indefinite duration which contain an express covenant of good faith. Nor is it appropriate for this Court to speculate on the holding of a Texas court faced with similar facts; one Texas court has commented that "there is no want of legislation which restricts an employer's ability to dissolve an employment contract. It would be impertinent for us to arrogate to ourselves the right to pass additional laws

under the guise of deciding cases." *McClendon,* 757 S.W.2d at 820.

■ Moreover, if Texas law permitted recovery for breach of such a covenant in this context, there could be no recovery under the facts of this case. The evidence does not support the conclusion that the company acted other than in good faith in terminating Karp. Black's Law Dictionary states that "good faith" is commonly "used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." Black's Law Dictionary 623–24 (5th ed. 1979). The Texas Supreme Court has stated in dictum that "One who acts honestly, and not fraudulently, is said to act in good faith." *Walraven v. Farmers' & Merchants' Nat'l Bank,* 96 Tex. 331, 74 S.W. 530, 534 (1903). The Uniform Commercial Code does not govern this case, but nevertheless provides an instructive definition: " 'Good faith' means honesty in fact in the conduct or transaction concerned." Tex. Bus. & Com.Code Ann. § 1.201(19) (Vernon 1968).

Honesty is clearly the central criterion for good faith, and for all the faults of the company in executing the termination, the record does not indicate that the decision to terminate Karp was anything other than honestly intended. The Court finds credible the evidence indicating that the company was opposed to romantic relationships between employees, and that Karp was terminated for engaging in such a relationship. Therefore, the Court finds no lack of good faith on the part of the company, even assuming Texas law permitted recovery on such a theory. Relief on this claim is therefore denied.

■ The "just cause" component of Karp's claim requires a different analysis:

A plaintiff who can prove that his employment at will is subject to an oral or written agreement that he will not be terminated except for good cause can recover for wrongful discharge, even if the employee has not agreed to remain in service for a definite length of time.

*Ramos,* 711 S.W.2d at 336. Texas law therefore expressly allows parties to an employment contract of an indefinite term to orally agree that termination will only occur for good cause. This raises the question of whether Karp and The Fair did in fact orally agree to condition employment in this way. Karp testified that Klein promised him he would only be fired for just cause. Klein, on the other hand, testified he told Karp that certain conduct would result in immediate termination. The record therefore does not appear to support a meeting of the minds on the issue of "just cause." In any event, even if this Court concluded that the parties' contract included such a "just cause" provision, there is no indication in the record that the termination was for anything other than just cause. Despite the company's many reasons proffered for the termination, the record most strongly supports the conclusion that Karp was fired for what the company believed was "immoral conduct." It is not for this Court to define "immoral conduct," nor to tell the company that "immoral conduct" is an improper ground for termination. If the Court were to find that such conduct does not constitute just cause for termination, it would merely be substituting its business judgment for that of the company, with no legal predicate whatsoever. Relief on the claim of termination without just cause must therefore be denied.

■ The Court next turns to the claims against Klein. Karp alleges that his termination by Klein was intended to inflict harm without excuse or justification, and that Klein is therefore liable on the theory of "prima facie tort." [1] Under this theory Karp is required to prove that Klein terminated him "maliciously ... 'for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired.' " *Durham Indus., Inc. v. The North River Ins. Co.,* 673 F.2d 37, 40 (2d Cir.) (citing *Aikens v. Wisconsin,* 195 U.S. 194, 203, 25 S.Ct. 3, 5, 49 L.Ed. 154 (1904)), *cert. denied,* 459 U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982). The Second Circuit, following the law as stated by the New York courts, has held that "a claim of prima facie tort does not lie where the defendant has any motive other than a desire to injure the plaintiff." *Id.*

It is clear in the present case that the company had many stated motives for terminating Karp. For purposes of this theory of recovery, it makes little difference whether Karp was terminated for insubordination, poor performance, or immoral conduct. At the very least, the record supports a finding that termination took place for one of these three reasons, and therefore does not support a finding that Karp was terminated out of malice alone. Accordingly, relief on the basis of prima facie tort must be denied.

Karp next claims that Klein was negligent in terminating him. The complaint sets forth several duties owed by Klein to Karp, and alleges breach of the duties and outrageous conduct on the part of Klein. As noted above, the at-will employment rule is subject to a fixed number of exceptions, and it would be inappropriate for this Court to fashion new "duties" to add to the existing body of Texas law. The Texas Supreme Court, certainly a more proper forum for this type of lawmaking, has modified the at-will rule only on the most careful consideration. *Sabine Pilot Serv., Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985). Relief on the claim of negligence is therefore denied.

Karp's final claim against Klein is based on intentional infliction of emotional dis-

---

1. The theory of prima facie tort was announced in 1904 by Justice Holmes. *Aikens v. Wisconsin,* 195 U.S. 194, 25 S.Ct. 3, 49 L.Ed. 154 (1904). The Justice noted that several courts at that time believed "prima facie, the intentional infliction of temporal damages is a cause of action" actionable at common law. 195 U.S. at 204, 25 S.Ct. at 5. Neither the courts of Texas nor the Fifth Circuit has directly passed on the Justice's remarks. This Court nevertheless assumes that the theory of prima facie tort was actionable at common law. The theory would therefore not stand as part of the "federal general common law," would thereby escape the declaration of *Erie Rd. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), and would be capable of application in Texas through that state's Rule of Decision statute, Tex.Civ.Prac. & Rem.Code Ann. § 5.001 (Vernon 1986).

 

tress. Finding no evidence that Klein's conduct was extreme or outrageous, relief on this claim is denied.

Based on the foregoing, all relief sought is denied.