Tammy CLARK, Plaintiff–Appellant,

v.

Dr. Sharon BANKS, in her official capacity as Superintendent of Lansing School District, William DeFrance, in his official capacity as Superintendent, Eaton Rapids Public Schools, Jennifer Granholm, in her official capacity as Governor of the State of Michigan, and Michael P. Flanagan, in his official capacity as Superintendent of Public Instruction, Michigan Department of Education Defendants–Appellees.

No. 05–2287.

United States Court of Appeals, Sixth Circuit.

Aug. 24, 2006.

Before: BOGGS, Chief Judge; COLE, Circuit Judge; and HOOD, District Judge.*

PER CURIAM.

Tammy Clark, a resident of the Ingham Intermediate School District (ISD) in Michigan, challenges the constitutionality and legality of Michigan's "school of choice" system, as it applies to students requiring special education. She seeks to enroll her developmentally disabled son, B.C., in the Eaton Rapid Public Schools (ERPS), which is part of a different ISD, despite the failure of the two ISDs to reach an agreement on the terms of his enrollment, as required by the governing state statute. She now appeals from summary judgment entered in favor of the defendants, who are school and government officials. The district court found a rational basis for Michigan's statutory scheme. We affirm the district court's grant of summary judgment.

*The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan.

**I**

Tammy Clark seeks to enroll her son, B.C., in the Eaton Rapid Public Schools (ERPS) under Michigan's School of Choice statute. As of August 2005, B.C. was six years old. He lives with his mother, Tammy Clark, in Lansing, Michigan. It is conceded that he has developmental disabilities that entitle him to special education services. Clark has worked in the Eaton Rapids area for roughly eight years. B.C. attends day care there. Clark sought in November 2003 to enroll her child in the Eaton Rapids school district, for the 2004–2005 school year, even though she does not live there.

At the time of Clark's November 2003 enrollment request, ERPS was accepting applications for enrollment by non-resident applicants residing in a district located in a contiguous intermediate district under the State School Aid Act of 1979, Mich. Comp. Laws Ann. § 388.1705c. Also at that time, the number of qualified non-resident applicants eligible for acceptance under the statute appears not to have exceeded the positions available for non-resident pupils at ERPS. For the 2004–2005 school year, ERPS accepted at least 67 school of choice students from other school districts.

The State of Michigan divides itself into 57 Intermediate School Districts. Each ISD has constituent member local districts, and every local district in the State is a constituent of one of these 57 ISDs. Defendant–Appellee Eaton Rapids Public Schools (ERPS) is a constituent local district of the Eaton ISD, and Defendant–Appellee Lansing School District (LSD) is a constituent local district of the Ingham ISD. Each ISD oversees, inter alia, the provision of special education and related services to the students in the ISD's con-

stituent local districts. Statutorily, ISDs must "[d]evelop, establish, and continually evaluate and modify in cooperation with its constituent districts, a plan for special education which shall provide for the delivery of special-education programs and services" to "each handicapped person ... who is a resident of 1 of its constituent districts...." M.C.L. § 380.1711(a) and (f). The plans must be approved by the State. M.C.L. § 380.1701(b). In implementing these plans, as the State points out, ISDs often create a "center program" for special-education students who are members of its constituent districts. Thus, statutorily, special education is managed on an ISD-wide basis.

Roughly 80% of a school district's revenue comes from the State through a per pupil foundation allowance. The State School Aid Act controls which students a district may claim in membership and how those students are counted. The foundation allowance is paid for pupils who are enrolled in regular daily attendance in the district on the pupil membership count days. Additionally, the State pays a district 28.6% of its total approved costs incurred in providing special education and related services. The federal government also provides funds for special education. ISDs also receive operational funds from the State. A local school district is not permitted to ask its voters to increase funding for special education through additional property taxes, but ISDs can and do ask voters to approve millage requests for special-education operating expenses across the ISD.

Typically, both general and special education students attend school in their districts of residence. Under M.C.L. § 380.1147, they have a statutory right to do so. However, under other state provisions, they may also attend school in other districts. At issue in this case is the portion of the State School Aid Act, M.C.L. § 388.1705c, that allows transfers.

General education students have a more streamlined process than do special education students to apply for enrollment in schools outside their own ISDs. Due to the higher costs of special education, the approval of applications by special education students is conditional on an agreement between the two school districts (each from different ISDs) as to how the special education services and funding will be provided. ERPS and LSD were not able to reach an agreement on the financial arrangements necessary to permit approval of B.C.'s application.

## II

Clark filed a complaint in the United States District Court for the Western District of Michigan on December 27, 2004, against Sharon Banks, William DeFrance, Jennifer Granholm, and Thomas D. Watkins, Jr., in their official capacities as superintendent of LSD, superintendent of ERPS, Governor of the State of Michigan, and Superintendent of Public Instruction of the Michigan Department of Education, respectively. The complaint sought damages, declaratory, and injunctive relief.

The essential gravamen of Clark's claim is that B.C. is suffering discrimination due to his special education needs. Were he a "typical," non-special education student, he would have been admitted into the school district to which he had applied. The defendants have consequently, in his view, denied him "an equal opportunity to take advantage of the benefits of the school of choice provision of the State School Aid Act of 1979, in violation of the Equal Protection Clause of the Constitution." He claims that the defendants have "intentionally discriminated against [him] on the basis of his disability and recklessly disregarded his rights under Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794, Section II of the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq., and the Persons with Disabilities Civil Rights Act, Mich. Comp. Laws Ann. § 37.1102 et seq."

The district court granted summary judgment in favor of the defendants on August 17, 2005. The district court issued a lengthy opinion explaining its order. The court framed the central question of the case as "whether the decision by the Michigan Legislature to require school districts to enter into a written agreement regarding the costs of special education prior to permitting a student to attend a public school of their choice violates" the provisions cited by Clark.

As the district court noted, "Michigan voters fundamentally altered the manner in which school districts are funded" roughly ten years earlier, through amendment to the state constitution. *See* Mich. Const. of 1963 art. 9, § 11. Prior to that amendment, "the majority of a school district's revenue came from local property taxes." The amendment,

> vastly changed this system. Currently, each school district receives funding directly from the state based on a per membership per pupil foundation allowance ('foundation allowance') as defined in Mich. Comp. Laws § 388.1620. The amount of the foundation allowance for each school district is determined through a weighted formula based upon the number of students who are enrolled and in regular attendance in the school district on two pupil membership count days. Mich. Comp. Laws § 388.1606(4), (8). In addition to the foundation allowance, the state reimburses school districts and ISDs for 28.6138% of their total approved costs of special education and 70.4165% of total approved

costs of special education transportation. Mich. Comp. Laws § 388.1651a(2). ISDs also annually receive additional aid from the state to 'be used to comply with requirements of this act and the revised school code ... and for which funding is not provided elsewhere in this act, and to provide technical assistance to districts....' Mich. Comp. Laws § 388.1681(1). ISDs and school districts also receive federal funding for special education pursuant to the Individuals with Disabilities Education Act (IDEA).

In addition to the funding from the state, ISDs are also statutorily authorized to, with voter approval, levy ad valorem property taxes for operational costs, and costs of special and vocational education programs. See Mich. Comp. Laws. §§ 380.625a (ISD 'may levy ad valorem property taxes for operating purposes at a rate not to exceed 1.5 times the number of mills allocated to the [ISD] for those purposes in 1993."); 380.1724a (special education millage); 380.681 (vocational education millage).

The district court described the Michigan school of choice system as a "voluntary program in which each school district determines whether or not it will accept nonresident applicants for enrollment." The court noted that M.C.L. § 388.1705c governs the "procedure by which a school district may enroll students from outside the district when it ... determines that it will accept applications for enrollment from nonresident students who reside in a district located in a contiguous ISD." The court emphasized that, under governing statutes, a school district retained the choice as to whether it would accept applications from nonresidents. However,

[a]fter choosing to accept nonresident applicants, there is very little discretion left to a school district in selecting or denying enrollment. Both statutes expressly prohibit a school district from granting or refusing enrollment 'based on intellectual, academic, artistic, or other ability, talent, or accomplishment, or lack thereof, *or based on a mental or physical disability.'* Mich. Comp. Laws §§ 388.1705(6); 388.1705c(6). Further, a school district cannot grant or deny enrollment 'based upon religion, race, color, national origin, sex, height, weight, marital status, or athletic ability, or, generally, in violation of state or federal law prohibiting discrimination.' *Id.* §§ 388 1705(8); 338.1705c(8).

Both statutes also provide that if the number of available positions in the school, grade, or program 'the school district shall accept for enrollment al of the qualified nonresident applicants eligible for acceptance.' *Id.* §§ 388 1705(13); 338.1705c(13). If, however, the number of qualified nonresident applicants exceeds the available positions in the grade, school, or program, 'the district shall use a random draw system' to fill the available positions. *Id.*

(emphasis supplied)

The court noted that a particular set of additional rules governs cases such as the one now appealed, in which a student from a contiguous ISD applies to enroll in a school district. The court quoted and cited Mich. Comp. Laws § 388.1705c(18), which provides:

In order for a district or intermediate district to enroll pursuant to this section a nonresident pupil who resides in a district located in a contiguous intermediate district and who is eligible for special education programs and services according to statute or rule, or who is a child with disabilities, as defined under the Individuals with Disabilities Education Act, title VI of Public Law 91–230, the enrolling district shall have a written agreement with the resident district of the pupil for the purpose of providing the pupil with a free appropriate public education. The written agreement shall include, but is not limited to, an agreement on the responsibility for the payment of the added costs of special education programs and services for the pupil.

It is conceded that such a written agreement is not needed for a general education student. It is further conceded that such an agreement is not needed when a nonresident student seeks to enroll in a school district within the same ISD.

When B.C. applied in November 2003 for admission to the ERPS for the 2004–2005 school year, James Ewing, Special Services Director for ERPS, wrote a letter to Tammy Clark informing her that B.C. would not be recommended for enrollment due to the written agreement requirement of § 388.1705c(18). He noted also that he had spoken with Jonathan Schelke, Director of Special Education for Lansing Public Schools, who informed him that LSD would provide B.C. with special education services.

Clark renewed her application for enrollment in June 2004. ERPS agreed to accept B.C. for enrollment contingent on an agreement, pursuant to § 388.1705c(18), between ERPS and LSD with respect to the additional cost for B.C.'s special education services program.

On July 1, 2004, ERPS submitted a proposed agreement to LSD. The agreement would have required LSD to release its $6,700 foundation allowance for B.C. to

ERPS. It would also have required LSD to reimburse ERPS for "any agreed upon costs unique to the student." The agreement also estimated the cost of educating B.C. in the ERPS to be $25,007 and provided that LSD would pay $18,307 to ERPS to make up the difference between the foundation allowance and the estimated cost.

Lansing School District rejected the agreement in a letter dated August 16, 2004. However, LSD also indicated a willingness to enter an agreement under which its only financial obligation was the release of its $6,700 foundation allowance. The letter explicitly communicated an unwillingness to take on further costs.

On September 16, 2004, ERPS offered a revised proposal. This version required release of the $6,700 foundation allowance plus reimbursement for specific further costs. This version calculated the total costs to be reimbursed by LSD to be $10,300, plus certain transportation costs. Again, LSD rejected the proposal.

Because ERPS and LSD have not been able to reach an agreement, B.C. has not been able to enroll in ERPS.

### III

Appellant's equal protection claim is subject to rational basis review. B.C. is not part of a suspect or quasi-suspect class. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Clark does not allege the violation of a fundamental right. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 37–38, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

Rational basis review affords a statute a "strong presumption of validity," and the statute "must be upheld as long as 'there is a rational relationship between the disparity of treatment and some legitimate government purpose.'" *Hadix v. Johnson,* 230 F.3d 840, 843 (6th Cir.2000) (quoting *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). The court is obligated to uphold the statute "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Walker v. Bain,* 257 F.3d 660, 668 (6th Cir.2001).

General education and special education students are not similarly situated for the purposes of equal protection analysis. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"). As the district court noted, under federal and state statute, a school district is required to furnish disabled students with special education services, and these services are "frequently" more costly than the services provided to general education students. The court correctly concluded that, "because school districts are obligated by federal and state mandate to provide special programs and services to disabled students, which often increase the cost of educating the student, [such disabled students] are not similarly situated to general education students."

■ There is a rational relationship between the Michigan provision and a legitimate governmental interest of ensuring adequate and equitable funding for the widely varying IEPs—with consequently varying costs—of special education students. Michigan reimburses school districts and ISDs for approximately 29% of total approved costs of special education and approximately 70% of special education transportation costs. Beyond this, the State allows ISDs to use a variety of funding techniques for to provide educational services. They are entitled to levy ad valorem property taxes for special

education purposes. If an ISD chooses to levy a special education millage, it may do so at a rate "not to exceed the number of mills of those taxes authorized in the intermediate school district in 1993." The ISD may then distribute the revenue from that millage at its discretion. Mich. Comp. Laws §§ 388.1651a(2) and 380.1724a(1) and Mich. Admin. Code R. 111(5).

As the district court explained, the Michigan statute properly accounts for the

> fact that federal and state law require that each special education student have an IEP which addresses their specific needs and provides them with a free appropriate public education.... By its terms, the required programs and services in an IEP will vary based upon the individual needs of the disabled student. Therefore, the legislature determined that the school districts must agree, on a case-by-case basis, on the allocation of costs to educate a special education student, pursuant to his or her IEP, who wishes to attend school in a contiguous ISD. The Court cannot say that such a decision is unreasonable.

One special education student's IEP may cost $7,000, and another's $27,000. Since this variance has not been shown to exist in the cases of general education students, there exists a rational relationship between the legitimate governmental purpose of ensuring the proper funding of all special education students' IEPs and the requirement that school districts enter into a formal written agreement—which incentivizes or catalyzes thoughtful examination of the availability of funds for a given applicant's IEP—before accepting special education students for enrollment. Moreover, under the IDEA, the resident district has an obligation to furnish a FAPE. The putatively receiving school district has none. Therefore, it is rational to allow the receiving district to negotiate the terms on which a student with special needs may enroll.

Clark argues that since foundation allowance funding for a given school district follows the enrollment numbers for that district, there is no rational basis for the state's written agreement requirement. The district court did acknowledge this claim as "partially correct." However, as the district court pointed out, Clark's view does not take account of the weighted formula used by the State to set the amount of the foundation allowance. This formula is such that a student new to the district carries three quarters of the total state funding for that student to his or her new district for the initial year of his or her enrollment, while the old district still receives a quarter of the funding allocation for that student for the year. Mich. Comp. Laws § 388.1606(4).

The district court further cited the May 6, 2005, affidavit of John Andrejack, supervisor in the Michigan Department of Education, Office of Special Education & Early Intervention Services, Finance Management Unit for the proposition that "federal funding received by the state under Part B of the IDEA is given to ISDs in three components, none of which would immediately transfer from a student's district of residence to their school of choice." This citation is quite apt. Andrejack's affidavit is clear on this point:

> The flow-through payment [from the federal government, under Part B of IDEA] to an ISD has three potential components. The first payment is a base award, which is a continuation of the federal money received in fiscal year 1999, the "base year" referenced in [34 C.F.R. § 300.712]. How much federal special education money a particular ISD receives is based on how many special-education students were

attending school in the ISD in 1998. Under this base award, an ISD receives approximately $519 per special-education student counted in the district in 1998. A special education student moving from one ISD to another does not affect this portion of the federal special education flow-through funds that an ISD receives.

 .... Once the total base award is subtracted from the total IDEA Part B Grant Award (and certain allowances are also subtracted) the remaining federal funds are apportioned on the basis of two additional calculations. First, 85% of the remaining amount is apportioned to ISDs based on their total number of students enrolled in the district, kindergarten through 12th grade (K–12), in both public and non-public schools. In fiscal year 2005 this award was approximately $96 per student. Student counts used for determining this portion are based on the student counts for that ISD from the previous school year as this is the best data available at the time that the flow-through calculations are made. Therefore, a student who transfers to a new ISD is counted in the previous ISD's membership count in the first year of attendance in a new ISD.

 .... Lastly, the remaining 15% of flow-through funds is apportioned on the basis of the number of students in each ISD who qualify for free school lunch. Eligibility for free lunch is used as a substitute for determining the number of students who live in poverty. This amount in fiscal year 2005 was approximately $66 per student. Again, the count for this portion of the federal flow-through payment is based on the previous year's count data because it is [sic] the best data available at the time the flow-through calculations are made. Therefore, a student who transfers to a new ISD is counted in the previous ISD's membership count in the first year of attendance in a new ISD.

The district court quickly addressed appellant's specific equal protection claim against DeFrance, Superintendent of the receiving district ERPS, in light of its finding that § 388.1705c(18) is valid. The court noted that it is undisputed that the two school districts did not reach a written agreement with respect to B.C.'s application. DeFrance complied with the state statute. The district court also considered the equal protection claim against Banks, Superintendent of B.C.'s home district LSD. The court noted that, contrary to Clark's allegation, the "undisputed evidence demonstrates that Banks does not maintain" a "blanket policy against entering into agreements for special education services under § 388.1705c(18)...." The court noted that the discovery evidence Clark relied on to make his claim against Banks was an affidavit of Jonathan Schelke, Director of Special Education for the LSD. This is a one-page affidavit. The relevant parts are:

3. Whenever a student who is a resident in the Lansing School District elects to enroll in another district within the Ingham County Intermediate School District, Lansing foregoes the revenue from the state's foundation allowance for that student and the student is counted in the membership of the enrolling district. This is true regardless of status as a general education student or as a student with disabilities eligible for special education and related services.

4. Whenever a Lansing student enrolls in a school district that is a constituent of a contiguous Intermediate School District exactly the same pro-

cedure is followed as described in paragraph 3. The practice of the Lansing School District is to release the foundation allowance only. The Lansing School district operates a comprehensive program of special education and related services for students with disabilities and unless it is specifically determined that the programs and services offered by the Lansing School District would be inadequate to provide the eligible student with the necessary special education and related services, Lansing does not enter into a cooperative agreement to pay for the services elsewhere.

Clark points to paragraph "4" of Schelke's affidavit as evidence of LSD's "blanket policy" against entering into agreements under § 388.1705c(18). However, the plain language of this affidavit does not indicate such a blanket policy. The statement may indicate a policy that results in very few agreements, because LSD may not wish to pay extra to enable the enrollment of a student in another district, even though LSD appears quite willing to pay the foundation allowance in order to facilitate such enrollment.

The evidence before the court offered no indication, in the court's view, that DeFrance or Banks violated any of the statutes Clark cites. DeFrance followed the commands of a valid law. He actively pursued an agreement with LSD but was not successful in securing one. In an attempt to reach an agreement, he even significantly reduced the amount demanded by ERPS in his second letter to the officials of LSD.

We emphasize that § 388.1705c contains express prohibitions— § 388.1705c(6) and (8)-against the making of enrollment decisions on the basis of applicants' disabilities. The district court concluded, perhaps a little ambitiously, that because a written agreement is required for special education students under § 388.1705c only when an applicant seeks to enroll across the borders of the ISD in which he resides, "[c]learly, the requirement is in place because of the special education student's residence, not because of any disability." We do not agree that the requirement is purely a function of residence. It is also a function of a student's disability. But because there is a rational basis for this statutory scheme, and since a rational basis review is what is required here, our disagreement with the district court on this particular does not disturb the result in this case.

## IV

We note also that the Michigan Legislature included a repealer provision in M.C.L. § 388.1705c. This provision requires that the entire "section is repealed if the final decision of a court of competent jurisdiction holds that any portion of this section is unconstitutional, ineffective, invalid, or in violation of federal law." M.C.L. § 388.1705c(21). The inclusion of a such a repealer suggests that the Michigan Legislature understood that its complex "school of choice" statutory scheme comprehended many related considerations of educational, financing, and other policy, as well as the nuanced interrelationships among them.

## V

■ Clark also challenges Mich. Comp. Laws § 380.1701(b) and the actions of the school districts under § 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disability Act (ADA), and Michigan's Persons with Disabilities Civil Rights Act.

As the district court indicated, there exists a great deal of analytic overlap among the three statutes. Specifically, each statute requires that the plaintiff show that he was discriminated against on the basis of his disability. Thus, under the Rehabilitation Act of 1973, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Similarly, the ADA's operative language reads: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Finally, the relevant Michigan statute reads: "The opportunity to obtain employment, housing, and other real estate and full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability is guaranteed by this act and is a civil right." Mich. Comp. Laws § 37.1102(1). *See also McPherson v. Mich. High Sch. Athletic Ass'n,* 119 F.3d 453, 459–60 (6th Cir.1997) (en banc) (noting that the Rehabilitation Act and the ADA require a "roughly parallel[ ]" analysis).

To show discrimination under these statutes, therefore, a "plaintiff must establish that (1) she has a disability; (2) she is otherwise qualified; and (3) she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of her disability." *See Jones v. City of Monroe,* 341 F.3d 474, 477 (6th Cir.2003) (describing the elements of a prima facie case of discrimination under Title II of the ADA). As we have indicated, B.C. was subject to the requirement of a written funding agreement in part due to his disability. However, as we have also explained, B.C.'s disability was not the sole reason for his exclusion from participation in Michigan's choice of law system. B.C.'s exclusion was also a function of his residence, as well as the funds attending his education. Therefore, B.C. has failed to show discrimination "solely because of [his] disability."

## VI

We therefore affirm the grant of summary judgment for the defendants.